13  587
5a   18

ARKANSAS RIVER LAND, TOWN & CANAL CO. ET AL. V. FARMERS' LOAN & TRUST CO. ET AL.

1. CORPORATIONS AND THEIR RIGHTS OF ACTION.— A corporation cannot maintain a suit for equitable relief, except as the representative of the stockholders, and if the stockholders are without equity, they cannot through the corporate organization, or in its name, obtain relief either for themselves or for the corporation.

2. SUITS MUST BE BROUGHT IN THE NAME AND BY AUTHORITY OF THE CORPORATION — WHEN INDIVIDUAL SHAREHOLDERS MAY SUE.— A corporation can obtain redress for a wrong committed against it only through the action of its regular officers, and, if they are unwilling or unable to act, the corporation as an entity has no means of obtaining a remedy.    Under such circumstances, if the individual shareholders are the owners of *bona fide* rights or interests in the corporation, and the same have been injured or are imperiled, they may maintain a suit in their own names for the protection of their equitable rights.

3. SHAREHOLDER — OWNERSHIP OF FICTITIOUS STOCK DOES NOT CONSTITUTE.— Under constitution, article 15, section 9, which has been embodied in the General Statutes of Colorado, sections 251, 340, relating to corporations, and which declares that no corporation shall issue stock except for labor done, services performed, or money or property actually received, and all fictitious increase of stock shall be void, persons to whom stock is issued, for which they do not pay or agree to pay anything, do not thereby become shareholders of the corporation in any sense, and cannot maintain an action as such.

*Error to District Court of Arapahoe County.*

THE action was instituted in the name of "The Arkansas River, Land, Town and Canal Company, a corporation: John W. Gaynor, Peter O. Gaynor, J. C. Abbott, J. F. Minnis, stockholders," etc., plaintiffs, against "The Farmers' Loan and Trust Company, Hugh Butler, A. B. McKinley and Otis L. Haskell," defendants.

The facts are sufficiently stated in the opinion.

Mr. L. C. ROCKWELL, for plaintiffs in error.

Mr. J. P. BROCKWAY, for defendants in error.

PATTISON, C.   It appears from the record in this case that in the month of December, 1883, the individual plaintiffs above named set on foot an enterprise, the object of which was the construction and maintenance of an irrigating canal in the valley of the Arkansas river, the acquisition and sale of lands, and other kindred purposes.

About the time mentioned the parties named, or some of them, went to the county of Bent, located and made a preliminary survey of a portion of the line of the proposed canal.   The object of this step appears to have been to provide *data* for a description of the location of the canal, to be inserted into the articles of incorporation of the company the formation of which they then contemplated.

On December 15, 1883, they caused a body corporate to be created and organized, the object of which was the prosecution of the enterprise mentioned.   The certificate of incorporation provided that the capital stock of the company should be $300,000, divided into three thousand shares of $100 each, and that the affairs of the company should be managed by three directors. . The plaintiffs, Abbott, Minnis and P. O. Gaynor, were named as such directors for the first year.   December 29, 1883, the di-

rectors named met and organized by the election of P. O. Gaynor as president, Minnis as secretary, and Abbott as treasurer. At this meeting each of these persons subscribed for one share of the capital stock of the company. The purpose of the subscription seems to have been to qualify the subscribers to act as officers of the company. Whether these parties, or either of them, actually paid their subscription is left in doubt. John W. Gaynor testified that at the time of the subscription $100 was paid by each subscriber, but that some part of the money so paid was returned to them in payment of expenses incurred before the organization of the company. This, however, is not very material, as it will appear hereafter that the entire capital stock was issued to these parties and others pursuant to the provisions of a contract between the company and the defendant Haskell. Haskell is the real party in interest, and will be spoken of hereafter as the defendant. January 29, 1884, at a meeting of the directors and all the stockholders of the company, the articles of incorporation were amended by increasing the capital stock from $300,000 to $1,000,000, and by increasing the number of directors from three to six. The new directors named were J. W. Gaynor, one of the plaintiffs, John S. Perkey and Henry D. Perkey.

January 31, 1884, at a meeting of all the stockholders, an issue of bonds to the amount of $300,000 was authorized, payment of which was to be secured by a mortgage or trust-deed upon all the property the company then had, or which it might thereafter acquire. This action was adopted and ratified on the same day by the board of directors.

After the organization of the body corporate, as above recited, the complainants and their associates began to take steps to obtain money for the prosecution of the enterprise. It appears that none of them were men of property. They therefore sought to interest others in the project. In February, 1884, with this end in view,

all of the plaintiffs and their associates in the enterprise
began negotiating with the defendant Haskell to secure
funds to build the canal.   The negotiations resulted in a
contract, made and executed March 1, 1884, between the
corporation and Haskell.   The provisions of the contract
necessary for the discussion of the case will be recited
hereafter.

It appears that the defendant, before undertaking to
provide the capital required, deemed it necessary to ob-
tain absolute control of the affairs of the company.   The
contract was so drawn as to practically suspend the oper-
ation of the provisions of the statute defining the rights
of stockholders, and providing for the election of officers,
for the period of two years from its date.   In the pre-
amble of the contract, among other recitals, the follow-
ing appears: "The said canal company, desiring to borrow
the sum of $200,000, upon the conditions and security
and for the considerations hereinafter named, hereby
agrees with the said Haskell and his associates or assigns,
as inducements and as security for the agreement, to
loan, or procure to be loaned, on the conditions herein-
after named, the sum of $200,000, or, in lieu thereof, the
construction of, or the procurement of the construction
of, the canal company's canal, and carrying on the other
business of the company at a total cost not in excess of
said sum of $200,000; and to secure the payment to said
Haskell and his associates or assigns of said sums,
whether loaned or expended on said account, the said
canal company will and hereby agrees."   This recital is
explanatory of the end sought to be attained by the con-
tract.   The first undertaking on the part of the company
is as follows: "*First.* To issue $500,000 of its capital
stock, and, on the signing of this agreement, deliver the
same to said O. L. Haskell or his associates or assigns,
as his or their separate interest in the capital stock of the
company, and which said interest of $500,000 in stock
of said company is not taken, or so as aforesaid issued,

in the nature of a security, but to be the separate property of said Haskell, his associates or assigns, in consideration of the premises."

Under this provision of the contract one-half of the capital stock of the company was to be issued to the defendant and become his property, without any consideration whatever. The purpose of the provision is manifest. It was to enable him to control the affairs of the company during the life of the contract. This purpose is again apparent in the second provision of the contract, which reads as follows: "Said O. L. Haskell, his associates or assigns, on the signing of this agreement, being a one-half owner of all the capital stock of this company, shall have the right to name three of the six directors of this company, and, if the directors are increased, one-half thereof; and to that end the said canal company hereby agrees to cause, by resignation of members of its present board, such vacancies as will admit of such selection of said three directors as said Haskell may name, and such resignation and election shall take place on signing of this agreement."

By the fourth paragraph the company agrees as follows: " The said canal company hereby agrees that upon signing of this agreement, or thereafter, on the request of said Haskell, his associates or assigns, its first mortgage bonds in the sum of $300,000, to be held by him or them as security for said sum of $200,000, or, in lieu thereof, all the things to be done and performed as herein provided; and said bonds, when so delivered, may be used as follows," etc. The provision made for the disposition of the bonds need not be stated.

The defendant, among other things, undertook and agreed as follows: " In consideration of the security herein provided to be given and held and used and sold by said O. L. Haskell, his associates or assigns, the said O. L. Haskell, his associates or assigns, hereby agrees to furnish the capital to construct the canal, and otherwise

carry out the object of the company, or cause the said work to be done, in the sum or total cost of the gross amount of $200,000, and the money is to be provided or the work paid for as hereinbefore provided, at the times hereinafter stated, to wit: * * * *Eighth.* The necessary amount to construct twenty-two miles of the canal from the head-gates. * * * The sum required for this purpose was estimated at $27,097.10. *Ninth.* The necessary amount to pay the first payment on the state land sought to be purchased, and not in excess of $3,375. *Tenth.* And said several sums of money, namely, $30,472.10, shall be furnished or said work paid for as herein provided within three months from the date hereof, and sufficient money advanced or paid on the work from time to time as will be required to make the enterprise progress advantageously, not inconsistent with the terms of this agreement."

By the thirteenth provision of the contract it was provided that the defendant might at any time prior to December 15, 1885, terminate the contract upon certain conditions named in its provisions, but it was expressly provided that the contract could not be terminated until the work provided for by the eighth, ninth and tenth provisions, above recited, had been completed.

By the fifteenth provision disposition is made of all the capital stock of the company. It reads as follows: "It is further agreed that on the signing of this agreement all of the stock of the company shall be issued and delivered to the persons hereinafter named, viz.: $500,000 of said stock to O. L. Haskell, his associates or assigns; $100,000 of said stock to P. O. Gaynor; $100,000 of said stock to J. W. Gaynor; $100,000 of said stock to J. C. Abbott; $100,000 of said stock to J. F. Minnis; $100,000 of said stock to H. D. Perkey. The said $500,000 of stock to be issued to O. L. Haskell, his associates or assigns, shall be issued full paid, in consideration of the things in this contract mentioned. The said $500,000 of the stock

to be issued to said P. O. Gaynor, J. W. Gaynor, J. C. Abbott, J. F. Minnis and H. D. Perkey shall be issued full paid, in consideration of work, labor, money expended and paid, and for other valuable and sufficient considerations. All said stock shall be issued in such certificates, as to number of shares in each certificate, as each of said persons may elect, and, in addition to the ordinary language of such certificates, there shall be printed thereon the words and figures as follows: 'This certificate is issued subject to the terms of a certain contract bearing date March 1, 1884, on file in the office of the canal company, marked "Exhibit A."' " The contract also contains the provisions usual in a contract for the construction of a canal, such as prices for earth-work, rock-work, specifications, classifications, etc.

Immediately upon the execution of the contract its formal parts were at once carried out. Certain of the directors resigned, and other directors, representing the interests of Haskell, were elected to supply their place, and defendant himself was elected president. All of the capital stock was issued and delivered to the several parties as provided by the contract. The defendant then entered upon its performance. Failing to negotiate the bonds, he undertook the construction of the canal himself.

The minutes of the proceedings of the board of directors are made a part of the record. From these records it appears that from time to time the dimensions of the canal, as stated in the contract, were changed by resolution of the board; and that the complainants, or a majority of them, were present and participated in the proceedings of these meetings. It further appears that defendant, as the work progressed, presented statements of moneys expended for labor and materials, all of which were considered and allowed by the board. The defendant continued the prosecution of the work until the winter of 1886. The time within which he had an elec-

tion to terminate this contract was frequently extended. Finally, unable to negotiate the bonds, or to raise the money necessary to complete the canal, he terminated the contract in accordance with its terms. Notice of such termination was in writing, and appears to have been delivered at a meeting held January 20, 1886. There were present at the meeting complainants J. W. Gaynor and J. C. Abbott, and J. P. Brockway, J. C. Skiles, O. L. Haskell and O. S. Perkey. At this meeting the defendant presented a statement showing that the amount expended by him under the contract was $33,351.81. This sum appears, by the record of the meeting, to have been allowed and unanimously approved by the board of directors.

So much of the history of the issue of bonds provided for by resolution passed in February, 1884, as is essential to an understanding of the case, will now be given. In August, 1884, bonds of the par value of $300,000 were issued and delivered, with a deed of trust, to the Farmers' Loan & Trust Company of the state of New York as trustee. By the terms of the trust it appears that the trustee could sell the bonds only for cash. On the 21st day of May, 1885, at a meeting of the board of directors of the company, a resolution was passed directing the president and secretary to make an order requiring the trustee to deliver the bonds to said Haskell, or to take such other steps as might be necessary and proper to enable him to obtain possession of them. The trustee refused to comply with this order, because contrary to the terms of the trust. Thereafter, and after the allowance of the claims of the defendant for $33,351.81, as above stated, he caused the sum of about $30,000 to be deposited in the German National Bank of Denver, to be used for the purchase of thirty of the bonds. The bonds were forwarded by the trustee to the bank, and delivered to the defendant. The company thereupon became entitled to the money deposited by defendant. The defendant

then presented and delivered to the bank the vouchers which had been approved by the company for the sum above stated, and received back the money deposited by him. In this manner he obtained possession of the bonds. Up to that time all, or nearly all, the money which had been expended in the prosecution of the company's business had been expended by defendant. Nothing had been paid to him on account thereof except the thirty bonds which he had obtained in the manner above mentioned. These bonds were the only bonds which had been disposed of by the trustee. The company being in default in payment of interest, the defendant, as the holder of all the bonds sold, requested the trustee to foreclose the trust-deed by sale of the property under the power of sale therein. In compliance with this request the trust company caused the property to be advertised for sale, and thereupon this action was brought to restrain the sale, and for other relief, as will hereafter appear.

The averments of the bill need not be set out at length. For the purposes of this discussion, it is sufficient to say that the individual plaintiffs allege that they are stockholders of the corporation; that a contract was entered into between the company and the defendant, the details of which are set forth in the bill; that upon the execution of the contract all of the capital stock of the company was delivered to the parties, as hereinbefore stated. Fraud and misconduct on the part of defendant and the several directors representing his interests in the company are then alleged, but the details need not be given here.

By the ninth paragraph of the complaint it is averred that "immediately after the month of March, 1884, and soon after said Haskell and his friends became members of the board of directors of this canal company, all of the stock of said canal company was issued as provided for in said contract, namely, five thousand shares or

$500,000 worth of stock was issued and delivered to said Haskell, and the balance of said stock, being five thousand shares, was issued and delivered to said John W. and P. O. Gaynor; J. C. Abbott, J. F. Minnis and H. D. Perkey each receiving one thousand shares; that none of the last-named parties paid anything whatsoever for said stock; that it was a bold appropriation of the stock of said company, without the respective parties paying a single farthing therefor, and the issue and delivery of said stock to said parties was wrong and illegal, contrary to the statute of the state of Colorado, and against public policy; that by the issuance and delivery of said stock not a dollar was put into the treasury of said canal company; neither was any money ever to be paid by either of said parties for said stock, and said company was to receive no benefit or advantage whatever therefor."

By the twenty-third paragraph it is averred that "said contract made between said company, plaintiff, and said Haskell on March 1, 1884, is illegal and void; that it is against public policy to allow said Haskell, who was a stockholder, director and president of said company, to make such a contract with it, but nevertheless said company, plaintiff, acknowledges its indebtedness to said Haskell in a certain amount, but not to the amount that said Haskell claims; and it is willing to pay said Haskell what is right and proper in the premises, for all money he has advanced for said company, and for what work and labor he has done for it in building and constructing said canal; but, to arrive at said amount, it is necessary to have an accounting between said plaintiff company and said Haskell; that when said amount is arrived at, unless said plaintiff company pay said Haskell the same within a reasonable time, that said company's property and franchises may be sold to pay the same."

It is averred, generally, that Haskell, Skiles and Brockway, three of the directors of the company, would not consent to the bringing of the suit to restrain the Farm-

ers' Loan & Trust Company from making the sale.   The
complainants pray for a decree restraining the sale of
the property, and forbidding the transfer of the stock
and the bonds of the company; they ask for an account-
ing, and a return by the defendant of his stock, and offer
to return theirs, and that all of the stock, except five
shares, be declared illegal and void; that the bonds be
declared void; that the contract may be canceled; and
for other relief.   The answer of defendant puts in issue
all material allegations of the complaint.

After the issues were settled a trial was had which re-
sulted in a judgment dismissing the bill.   A review of
this judgment is sought in this court.

The error assigned is that the judgment is against the
evidence and the law.   The questions presented for con-
sideration are certainly novel in their character.   It may
well be doubted whether a body corporate, or the share-
holders of a corporation, ever presented a parallel case
to a court of law or equity.   Upon the oral argument it
was practically conceded that the individual plaintiffs
were not entitled to relief.   Nevertheless it was con-
tended that the corporation itself was entitled to consid-
eration, because, being but a legal entity, and having no
existence except in legal contemplation, it was incapable
of participation in the illegal and fraudulent transactions
detailed in the bill and established by the evidence.   This
contention affords one of the most extraordinary in-
stances of an attempt to separate the body corporate
from its constituency which has arisen in the history of
corporate litigation.   That it cannot be sustained is clear
upon principles so long established as to be elementary.
Plaintiffs in error are confronted with these principles at
the very threshold of their case.

From the conceded facts it appears that, at the time
the contract was made and executed, the issuance of the
bonds, and the execution of the trust deed to secure the
same, authorized, and all the capital stock distributed,

the parties participating in these transactions were the entire constituency of the corporation. There was no dissenting voice. The corporation itself, therefore, was not only involved in, but must be deemed to have assented to, all these transactions. It is true that for some purposes a body corporate is sometimes regarded as a legal entity, or a fictitious person having a distinct existence. This fiction is not recognized in equity. The reason is clear. Without organization and members, without officers and stockholders, a corporation is but a naked body. It may be authorized to exercise corporate franchises, but is without means or instrumentalities for such exercise. It is clear, therefore, that a body corporate cannot maintain a suit for equitable relief, except as the representative of the stockholders.

It necessarily follows that if the shareholders are without equity they cannot, through the corporate organization, or in its name, obtain relief either for themselves or for the corporation. "In equity the conception of a corporate entity is used merely as a formula for working out the rights and equities of the real parties in interest, while at law this figurative conception takes the shape of a dogma, and is often applied rigorously, without regard to its true purpose and meaning. In equity the relationship between the shareholders is recognized whenever this becomes necessary to the attainment of justice; at law this relationship is not recognized at all." 1 Mor. Priv. Corp. § 227.

At the very outset of the discussion, then, it must be assumed that, in a suit of this nature, the corporation and the individual plaintiffs cannot be separated. It follows that, if the individual plaintiffs are not entitled to relief, as counsel admits, the corporation is not, and the judgment dismissing the bill might, very properly, be affirmed without further discussion.

Again, the question presents itself whether the corporation has or can have any standing as a party complain-

ant in this case.   The corporation and the shareholders have united as co-plaintiffs.   They are seeking the same relief.   It is an elementary principle that a shareholder must protect his interests in the corporation through the corporate organization, if possible.   He may maintain an equitable action, as a shareholder, if wrong has been done to the body corporate by its officers or agents, and that body is in such a position that it cannot protect its rights.   Such action must be brought in behalf of all the shareholders.   The shareholders are substituted for the body corporate for the reason that that body cannot act for itself.   A corporation, both at common law and under the statute, acts by and through its trustees and agents, and cannot act otherwise.   It is a part of the contract of subscription of a shareholder that the affairs of the corporation shall be governed and controlled by its directors or trustees, or other duly authorized agents. By section 6 of the corporation statute it is expressly provided that "the corporate powers shall be exercised by a board of directors or trustees, of not less than three nor more than thirteen, who shall respectively be stockholders in said company," etc.

It is alleged in the complaint that three of the directors of the company refused to consent to the bringing of this suit, and that the fourth was absent.   The suit, therefore, was brought in the name of the corporation without authority.   The board of directors alone could sanction such a proceeding.   The body corporate, therefore, is not properly a party complainant.

In section 238 of Morawetz on Private Corporations it is said: "Only the regular officers or agents, whose appointment was provided for expressly or impliedly by the charter or articles of association of a corporation, have authority to act for it; the individual shareholders, as such, have no such power, either to represent the body corporate, or to bring suit in its behalf, or to interfere in any way with its management.   It is only by consent of all the shareholders that any agent can derive his author-

ity to represent the whole body corporate. It follows, therefore, that a corporation can obtain redress for a wrong committed against it only through the action of its regular officers; and, if these are either unwilling or unable to act, the corporation as an entity has no means of obtaining a remedy. Under these circumstances it becomes necessary to take cognizance of the equitable interests of the individual shareholders, and to allow them to sue for the protection of their rights."

Upon the propositions above discussed, see chapter 5, Mor. Priv. Corp., entitled "Rights and Remedies of Shareholders," and cases cited.

It is clear that the corporation, as such, is not before the court, and as to it the court below might have properly dismissed the bill for this reason alone.

Again, are the individual complainants in a situation to entitle them to invoke the aid of a court of equity? It is alleged in the bill that they are shareholders. It appears that they are nominally the holders of four thousand shares of the capital stock of the company. It is expressly alleged in the bill that neither of these parties paid, nor agreed to pay, anything for the stock issued to them. There is some contention that they were the owners of four shares of stock upon which something was paid, but the fact that the whole or the greater part of the money paid was received back on account of claims which arose before the corporation was organized makes the contention unworthy of consideration. The naked question presented is whether these parties, as holders of four thousand shares of fictitious capital stock, are shareholders of the company, and in a position to entitle them to be heard in a court of equity. The rights of third persons are not involved in this case, and the sole question is whether, as between the parties, fictitious stock, issued by a corporation, has any validity; in other words, whether the parties to whom such stock is issued become shareholders in any legal or equitable sense.

The purpose of the capital stock of a corporation is well

understood.    The fact that, by a certificate of incorpora-
tion, the capital stock of a company is fixed at a specific
sum does not of itself create anything of value.    Its effect
is simply to confer authority to issue capital stock to the
amount stated, in accordance with the provisions of the
law under which it was created and organized.    This
power constitutes a corporate franchise.    It can only be
exercised by means of contracts entered into with per-
sons who desire to become stockholders.    Such contracts,
when based upon a consideration, and enforceable, con-
stitute the sole test by which the question can be deter-
mined whether a person claiming to be a stockholder is
such in fact.    There must be mutuality.    The stockholder
must be in a position to enforce his rights, and compel
the corporation to recognize him as a stockholder.    The
corporation must be able to enforce the subscription
agreement.    Any discussion of the terms and conditions
upon which such contracts might be made at .common
law is unnecessary in this state, because, by the organic
law itself, the powers of bodies corporate in this respect
are expressly declared.    Section 9 of article 15 of the con-
stitution provides that "no corporation shall issue stocks
or bonds, except for labor done, services performed, or
money or property actually received, and all fictitious in-
crease of stock or indebtedness shall be void."    This
constitutional provision has been embodied in sections
251 and 340 of the statute relating to corporations.    The
meaning of the language of the constitution is clear and
unmistakable.    If stocks or bonds be issued, "except
for labor done, services performed, or money or prop-
erty actually received," such issue is in direct violation
of the constitution and the statutes, and *ipso facto* in-
valid.

The provision of the constitution of the state of Illinois
relating to this subject is the same, in effect, as that of
this state, except that its operation is confined to railroad
corporations.    In the case of *Railroad Co. v. Thompson,*

103 Ill. 187, this provision was construed. In that case it was held that "the object of section 13, article 11, of the present constitution, in providing that 'no railroad corporation shall issue any stock or bonds except for money, labor or property actually received and applied to the purposes for which such corporation was created;' and that 'all stock, dividends and other fictitious increase of the capital stock, or indebtedness of such corporation, shall be void,' was to prevent reckless and unscrupulous speculators, under the guise or pretense of building a railroad or of accomplishing some other legitimate corporate purpose, from fraudulently issuing and putting upon the market bonds or stocks that do not and are not intended to represent money or property of any kind, either in possession or in expectancy, the stock or bonds in such case being entirely fictitious."

A like statute of the state of Wisconsin was considered in the case of *Clarke v. Lumber Co.* 59 Wis. 655. In the course of the opinion Taylor, J., says: "The contract for the sale and purchase of the stock was clearly void under the statute. The statute was a declaration of a public policy first enacted as chapter 24, Laws of 1874, and is clearly in the interest of public morals, and tends to the protection of those dealing with corporations. Most of the corporations created under the laws of this state have no fund or capital which their creditors can reach, except that derived from the issuance or sale of their stock; and, if this law be strictly followed in every case, corporations will not get credit upon the false pretense of having a large paid-up capital, when in fact a small percentage of the par value of the stock issued has ever come into the treasury of the company. The law is undoubtedly a salutary one, and its violation is clearly an illegal act, though no punishment is imposed by the statute for its violation. *  *  * "

But the citation of authorities is unnecessary. The language of the constitution is clear. Plaintiffs could

maintain this action only by showing that they were shareholders, and vested with contract rights, of which the stock certificates issued to them were the evidence, which they could enforce against the corporation itself. This they have utterly failed to do. On the contrary, by the express allegations of the complaint it appears that they acquired the stock, not only in fraud of the rights of the corporation, but in express violation of the constitutional mandate of the state, and of the provisions of the law under which the corporation was organized. The stock held by them is fictitious, within the meaning of the constitution, and no rights can be predicated upon it, either in law or equity. The bill was therefore properly dismissed as to them.

It is unnecessary to discuss other questions presented by the record. The complainants are without equity. Even assuming that the individual plaintiffs were shareholders, to the extent of one share each, they participated with the defendant in all the alleged illegal transactions, and for that reason alone they cannot be heard. The contract now sought to be avoided was negotiated by them with full knowledge that Haskell was to be president of the company, and to exercise absolute control over its affairs. They were advised of every step taken under the contract, yet the record fails to show that they ever objected. All the expenditures made by defendant were made with their knowledge and approval. The entire stock of the company was fraudulently and illegally issued and converted by them and by the defendant. The issue of the bonds and the execution of the trust deed were authorized by them. They ask for an accounting, yet it does not appear that they or either of them ever expended a dollar which would constitute a legitimate claim against the corporation or against the defendant. They ask that the bonds and the trust-deed be declared void, yet, by their own admissions, their interest in the corporate property is merely nominal.

Throughout the whole of this extraordinary record of fraud and violation of law in the administration of the affairs of this corporation, these parties appear first as promoters, and at all times as active participants in every illegal transaction. Counsel for plaintiff in error states in his brief that the court below dismissed the bill because *ex turpi causa non oritur actio*. The maxim was well and aptly applied. The judgment should be affirmed.

REED and RICHMOND, CC., concur.

PER CURIAM. For the reasons stated in the foregoing opinion the judgment is affirmed.

*Affirmed.*

MR. JUSTICE ELLIOTT, having tried the cause below, did not participate in this decision.