## ADAMS & WESTLAKE CO. v. DEYETTE *et al.*

The assets of a corporation for profit being a trust fund for its creditors, and its officers, in anticipation of insolvency, being unauthorized to diminish its capital, and release its stockholders from liability, in a manner that will inevitably defeat the rights of *bona fide* creditors, a judgment confessed in favor of persons who loaned to its directors money for the purpose of, and with actual knowledge that the funds advanced were to be used in, the purchase of shares in itself, is void as to such creditors because, (a) When insolvency occurs, a corporation has no authority to prefer creditors. (b) A corporation, as such, has no power to create a debt by borrowing money with which to purchase its own stock. KELLAM, J., dissenting.

(Syllabus by the Court.    Opinion filed Dec. 28, 1895.)

Appeal from circuit court, Brown county.    Hon. E. G. SMITH, Judge.

This case was first decided by this court in an opinion reported in 5. S. D. 418, 59 N. W. 214, in which opinion the judgment of the court below in favor of plaintiff was affirmed. Thereafter a rehearing was ordered in the case. This opinion is upon the rehearing. The former decision adhered to.

*Frank A. Luce*, for appellant.

There being no finding that defendant knew that the consent of the stockholders had not been obtained, it must be presumed in favor of the legality of his judgment and claim that he did not know it. Greenhood on public policy, Rule 130; Garden v. Pleasants, 54 N. W. 832; Bank v. ——, 12 Wheat. 70; School v. Collins, 6 Dak. 145; Railroad v. McCleary, 96 U. S. 258; Swam v. Swam, 21 Fed. 299; Curtiss v. Gakey, 68 N. Y. 304; Waite Fraud. Convey. 433; Campbell v. Gold, 51 Fed. 1; Henry v. Ins. Co., 169; Comp. Laws, § 3558. National banks are forbidden to loan money on real estate securities, but if they do so loan they can enforce the contract. Nat'l Bank v. Mathus, 98 U. S. 621; *Id*. v. Whitney, 103, *Id*. 621; Snope v. Leffurgwell, 105, *Id*. 3; Reynolds v. Crawford, 112, *Id*. 405; Bond v. Terrell, 37 Corp. Cases, 112.

*John H. Perry*, for respondent.

A decision which is right will not be reversed because based on a wrong or an insufficient reason. Hayne New Trial & App., § 284. The capital of a corporation cannot be used to purchase shares of its own stock. Morawitz Corp. § 793; Green Brice's *Ultra Vires*, 769.

FULLER, J. This case, now before us on rehearing, is reported in 5 S. D. 418, 59 N. W. 214, where the unassailed substantive facts are stated as follows: "On the 9th day of May, 1888, the Hicks-Trask Hardware Co., a corporation, being insolvent, confessed judgment against itself in favor of each of the defendants C. E. Deyette and W. W. Lewis, amounting to $1,469.26; the Deyette judgment being for $649.84, and the Lewis judgment for $819.42. After entry of the above judg-

ments, and on the 12th day of the same month, said defendant confessed numerous other judgments, among which there was one in plaintiff's favor for $1,319.47. Executions issued in succession, and the property of the defendant corporation was levied upon in the order above indicated, and in the order in which the respective judgments were entered and docketed; and the property of the corporation was found to be insufficient to satisfy the judgments which preceded that of the plaintiff. The referee made, among others, the following findings of fact: '(14) That the consideration of the confession of judgment in favor of Charles E. Deyette was as follows: $514.60, money loaned to the Hicks-Trask Hardware Company on January 20, 1888, was borrowed by said company for the purpose of using the same to purchase the stock of said company held by Trask, and on account of the indebtedness of $134.22, owing to said Deyette by said corporation for work and labor done by said Deyette for said corporation. (15) That the defendant Deyette had actual knowledge of the purpose and intent of the said corporation to use the same in the purchase of stock. (16) That the consideration of the judgment of the defendant Lewis was $514.60, money loaned to the said corporation by him about January 20, 1888, and borrowed by said company for the purpose of using the same in the purchase of stock of said corporation held by Trask; and the sum of $304.07, due Lewis from said corporation on account of services rendered by Lewis to said corporation. (17) That defendant knew of the purpose and intent for which said money was borrowed by said corporation. (18) That the defendant Lewis, at the time of and prior to the making of said confession of judgment to himself, was a director of said corporation, and secretary thereof, and signed said confessions as secretary on behalf of said corporation. (19) That the defendant Deyette, at the time of said confessions of judgment by said corporation to himself, was not a director. (20) That no written consent of the stockholders of the Hicks-Trask Hardware Company was ever had to the pur-

chase of stock from Trask by said corporation. (21) That on May 12, 1888, executions were issued from the district court upon the said judgment of said plaintiff to the sheriff of Brown county, in which said defendant the Hicks-Trask Hardware Company had its place of business. (22) That executions issued from the clerk of the district court of Brown county on each of the judgments of the defendants Foster, Deyette and Lewis, and were by him levied on the personal property of the Hicks-Trask Hardware Company, and all thereof; and the said sheriff sold the same, and holds the money realized from said sale, to be applied on said executions according to the decree of this court. (23) That the proceeds arising from said sale are not sufficient to pay the judgments against the Hicks-Trask Hardware Company prior to the judgment of plaintiff.' Upon these findings of fact the following conclusions of law were based: '(2) That the judgment of the defendant Deyette, as to the sum of $514.60, money loaned to the said corporation for the purpose of purchasing stock, is invalid, for the reason the Hicks-Trask Hardware Company, and the officers thereof had no power to borrow money for the purchase of its stock; and the defendant having loaned said money knowing of the illegal purpose for which it was to be used, cannot recover the same from said corporation. (3) That as to the sum of $134.25, included in the judgment of said Deyette, the same is valid, and should stand, and be enforced for said sum of $134.25. (4) That judgment of the defendant Lewis is invalid for the reason that the confession of the same, made by him and obtained by him when he was a director of said corporation, was an illegal preference as against the creditors of said corporation, and that the relief prayed by plaintiff should be granted as against said Lewis. (5) I further find as to the judgment of the defendant Lewis that as to the sum of $514.60 it is invalid for the reason that, as to said amount, the consideration was for money loaned to said corporation by Lewis for the illegal purpose of purchasing stock of said corporation.' Judgment by the court was

accordingly entered on motion of plaintiff's counsel, and defendants Deyette and Lewis appeal therefrom."

In order to affirm the contention of appellant's counsel and disaffirm our former conclusion, we must adopt and proclaim a rule by which a corporation without surplus profits or unemployed capital may, in contemplation of insolvency, borrow money with which to purchase shares in itself, and, when insolvency occurs, give a preference to the persons from whom the loan was made, by confessing judgments in their favor for an amount equal to the corporate assets, at a time, for the purpose of, and in such a manner that the rights and claims of *bona fide* creditors are entirely defeated. In determining the rights of these parties, rules of law and statutory provisions bearing upon the questions presented must be viewed in the relation that each bears to the other; and all must be considered with reference to an enlightened public policy, upon which is based a strong and wholesome rule of law, prohibiting a corporation from distributing its capital among shareholders by the purchase of stock in itself to the inevitable detriment of creditors. As observed by Mr. Thompson in the second volume of his recent commentaries on the Law of Corporations, at page 155: "Stringent precautions to prevent the reduction of the capital of a limited company without due notice and judicial sanction would be idle if the company might purchase its own shares wholesale; and, if it were otherwise, the result would be that the shareholders would receive back the money subscribed, and there would thus pass into their pockets what before existed in the form of cash in the coffers of the company, or of buildings, machinery, or stock, available to meet the demands of their creditors. * * * The purchaser of the stock must be one who succeeds to a liability, distinct from and in addition to that of the corporation." Mr. Spelling, after conceding that the foregoing rule is supported by the irresistible weight of authority, and in connection with a suggestion that he can see no valid reason why shares in itself might not be

purchased by a corporation, provided always that by so doing its capital stock is not diminished and its creditors are not injured, states the rule as follows: "A purchase of shares in itself by a corporation would be *ultra vires* wherever and whenever the effect would be to diminish its capital and lessen the security of its creditors." 1 Spell. Priv. Corp. 168. Mr. Morawitz says that: "No verbiage can disguise the fact that a purchase by a corporation of shares in itself really amounts to a reduction of the company's assets. * * * The fact that such a transaction may not necessarily be injurious to any person is not a sufficient reason for supporting it. It is contrary to the fundamental agreement of the shareholders, and is condemned by the plainest dictates of sound policy. To allow the directors to exercise such a power would be a fruitful source of unfairness, mismanagement and corruption. It is for these reasons that a shareholder cannot be allowed to withdraw from the corporation with his proportionate amount of capital, either by a release and cancellation before the shares have been paid up, or by a purchase of the shares with the company's funds." Cases almost innumerable are cited by each author in support of the foregoing rule, based upon the equitable principle that the assets of a corporation are a trust fund for its creditors— a doctrine that so completely pervades and enters into the warp and woof of the law of corporations that no literary effort, by whatever degree of legislative sanction or judicial sagacity aided, can destroy the immutable principles of justice and considerations of public policy from which the doctrine emanates, and upon which the rule is based. For the reason that creditors of a corporation cannot, as in case of a partnership, ultimately look to those who constitute the membership for the payment of their claim, the law requires corporations for profit, as a condition precedent to the commencement of business and for the protection and security of creditors, to have capital stock and shareholders, and to hold that they may, upon the strength of their capital, incur debts in the prosecu-

tion of legitimate corporate business, and then destroy their assets and the credit of the corporation by borrowing money with which to purchase shares in themselves, and defeat their creditors by confessing preferred judgments in favor of those who loaned the money with a knowledge of the purpose for which it was to be used, would be to sanction a fraud and judicially approve a vicious species of *legerdemain.*

Commencing at page 5115 of the fifth volume of his Commentaries, Judge THOMPSON approves in a vigorous manner the rule adopted by all recent text writers, which asserts and emphasizes the proposition that the assets of a corporation are a trust fund for its creditors; and, after stating that it is the only doctrine worthy of any respect, proceeds to discuss at length the fallacy by which courts have been led to hold that a corporation anticipating insolvency has the power of a private individual to deal with its assets, and under like circumstances to prefer creditors; and at page 5121 he concludes his observations in part as follows: ''It is thus perceived that the courts which have adopted the doctrine that an insolvent corporation may prefer its creditors have jumped at the conclusion by reasoning that, in the absence of statutory prohibitions, a corporation has the same power in disposing of its property that an individual has. But in adopting this hasty conclusion they have overlooked the fact that the anology between an insolvent individual and an insolvent corporation wholly fails in this: that, although an insolvent individual may turn over his property to certain of his creditors whom he desires to prefer, and may, by so doing, hinder and delay the others, yet he merely hinders and delays them; he does not, by that act, destroy himself; he still lives; and he may, and often does, get on his feet again, and acquire property, and discharge his previous obligations. But when a corporation becomes insolvent, and ceases to have the means of carrying out the objects of its creation, and disposesses itself of all its property, it destroys itself and, becomes *ipso facto* dissolved, and, in fact, is regarded

as a dissolved corporation for many purposes having reference to the rights of creditors.     An assignment for the benefit of creditors is, in point of fact and experience, an end of the corporation; and to this statement there is not one exception in a thousand cases, as every lawyer and judge knows.     The corporation, after such a catastrophe, not only has nothing more for its unprefered creditors, but it will never have anything more for them.     Its act of exhausting its assets in preferring particular creditors deprives the others of all remedy, unless in those cases where the law has left them the remedy of proceeding against its stockholders."     In determining whether a corporation, organized for the purpose of dealing in hardware at wholesale, has power to borrow money with which to traffic in its own shares, and thereby relieve its stockholders from liability, the question of intent is of no importance, when the  inevitable result must bring disaster to honest creditors.     As between them and the money loaner, in case of insolvency, a knowledge of the purpose for which the funds were borrowed is sufficient to at least postpone his claim until they have been paid in full; otherwise it would be a popular scheme for a corporation to incur debts, limited in extent only by its ability to engender confidence, and then, in contemplation of suicidal dissolution, borrow money from some trusted friend with which to purchase its entire stock, upon the assurance that by its last official act, and by a judgment timely confessed, the proceeds of the entire assets of the company shall be turned into the pockets of the man who loans the money with a knowledge of such fraudulent purpose, and to the exclusion of honest persons who extended credit, believing that the assets of a corporation are a trust fund for the benefit of creditors.     A corporation, as such, has no power, under the statute, to enter into any obligation or contract except such as are necessary and essential to the transaction of the ordinary business for the prosecution of which it was organized; and in recognition of the trust-fund doctrine the directors are expressly prohibited

from diverting, withdrawing, or paying to stockholders any part of the capital stock, and are in their individual and private capacity made jointly and severally liable to the creditors of the corporation, to the full amount so "divided, withdrawn, paid out, or reduced, or debt contracted." Comp. Laws, §§ 2917, 2928. Section 2917 is as follows: "Unless otherwise provided, a corporation may purchase, hold and transfer shares of its own stock, from its surplus profits, or as provided in the article on the assessment of stocks, or by the unanimous consent in writing of all its stockholders, in such manner and for such price or consideration as the said stockholders may unanimously decide upon." Although, by enabling a corporation to purchase shares of its own stock from its surplus profits, our legislature has to that extent encroached upon the otherwise invariable rule by which all such traffic is prohibited, the foregoing section, construed, as it must be, with other statutory provisions relating to the same subject, is not sufficient to empower a corporation, through the agency of its directors, to "divide, withdraw, or pay to stockholders, or any of them, any part of the capital stock," or to increase its liability by borrowing money with which to purchase shares in itself. This is obvious, because it is "otherwise provided," and because the power is, by the law of corporations, expressly withheld from directors and officers as such, as well as by that portion of Sec. 2917 which authorizes no purchase of stock in any manner, except from surplus profits, or by virtue of the law of assessment, unless the purchase be made by and through the unanimous consent and united individual action of all the stockholders, evidenced by a stipulation in writing, signed by every member, and specifying the consideration to be paid, and the manner of and the means by which the purchase is to be effected. Without such written consent, the corporation cannot be bound; and in the total absence of express or implied power to borrow money with which to purchase shares in itself, and in the face of the fact that the loaners thereof had actual

knowledge of the extraordinary use to which the funds were to be applied, their claims are *ultra vires*, and must not be asserted to the detriment of creditors. Lime Works v. Dismukes (Ala.) 6 South. 122. Actual notice on the part of one who loans money to a mercantile corporation that the funds so loaned are to be used for the purchase of stock in itself is sufficient to charge him with knowledge that such an unauthorized act works an immediate fraud upon creditors, and is, therefore, against public policy, and prohibited by the law of the land. These promissory notes upon which the Deyette and Lewis judgments were confessed, being *ultra vires* because the corporation was, under the circumstances, powerless to make them, it follows, of course, that the judgments were void to the extent of the money loaned for a purpose beyond the scope and object for which the corporation was created. Currier v. Slate Co., 56 N. H. 262; Richardson v. Sibley, 87 Am. Dec. 700; Pearce v. Railroad Co., 21 How. 441; Pennsylvania R. Co. v. Keokuk & H. Bridge Co., 131 U. S. 371, 9 Sup. Ct. 770.

We are fully aware that numerous cases may be found in which judges, though standing upon an eminence, have been unable to observe or unwilling to concede that the assets of an insolvent corporation are a trust fund for the benefit of all *bona fide* creditors, none of whom, at the hands of a corporation are entitled to a preference; but a careful research discloses no case which goes to the extent of holding that a corporation apparently in failing circumstances can borrow money with which to purchase shares in itself, and give to the persons from whom the money is borrowed a preference over all other creditors. Manifestly, a transaction so inconsistent with every consideration of common honesty and public policy, and so disastrous to the credit of corporations, as well as to the rights of those with whom they transact business, cannot receive the stamp of judicial approval. Adhering substantially to the views expressed in our former opinion, the judgment of the trial court is affirmed.

KELLAM, J. (dissenting).   I feel compelled to dissent from the conclusions of the court upon the main propositions discussed in the foregoing opinion.   It is always a matter of interest to the general student of the law to know the views of eminent text writers upon any legal question, but it must always be a matter of more particular interest to a court to know what its own legislature has made and established as the law of that jurisdiction; and so, when I find that the statute law of this state expressly allows a corporation to purchase shares of its own stock (Comp. Laws, Sec. 2917), I conclude that the wisdom or unwisdom of such policy is not a question for discussion or settlement by the courts of this state.   At all events, it is gratifying to know that, however bad the law may be, or however vicious its policy, it is not original with a Dakota legislature.   It is the law of many of the states.   It was broadly declared as general rule of law in the Field Commission Code; and in Bank v. Bruce, 17 N. Y. 507, Judge SELDEN said, "I am not aware of any common-law principle which forbids it."   Be that as it may, our statute says that it may be done, and it does not seem to me allowable for this court to say that what the statute authorizes is contrary to the policy of the law.

I think, too, that the argument of the opinion is predicated almost entirely upon assumed premises, to wit, that the corporation was insolvent, or in contemplation of insolvency, when it borrowed the money with which to buy this stock. The only finding is that it was insolvent when it confessed these judgments nearly four months afterwards.   For aught that appears in the record, its then insolvency may have resulted from causes entirely occurring after the money was so borrowed, and that at the time of the loan both borrower and lender may not only have thought, but known, that it was in a solvent and prosperous condition, and even that it then had "surplus profits" equal to the amount used in the purchase of this stock.   I do not suppose the fact that the corporation

borrowed money would prove that it did not at the time of such borrowing have surplus profits, for such profits would not necessarily be in money on hand. A condition or relation shown to exist will be presumed to continue, but the pre-sumption does not also reach backward. I think, therefore, that there is no warrant in the findings for treating the corpor-ation as insolvent when the loan was made, but that the same is purely an assumption.

If this case is rightly decided upon the facts found, it is because a note given by a perfectly solvent corporation, for money borrowed to purchase shares of its stock, the purpose being known to the lender, is invalid and unenforceable unless the subsequent purchase of such stock is made by the corpora-tion under the conditions named in the statute, or else that such note, good when made, becomes invalid by the subsequent in-solvency of the corporation. The last proposition seems utter-ly indefensible. It cannot be that a note, valid when made, becomes invalid by a change in the financial condition of its maker. If it is the intention of the court to rest its decision upon the first proposition, I am unable to understand how it can so confidently reach the conclusion it announces, without at least some consideration of the question whether Deyette's knowledge of the purpose for which the money was borrowed would invalidate his note. There is certainly a very respecta-ble, not to say formidable, line of authorities firmly holding that money loaned to a corporation for a confessedly *ultra vires* purpose is recoverable, although the lender knew that the money was to be so used. Some of these cases are collected in 27 Am. & Eng. Enc. Law, under head of "Ultra Vires." *Ex parte* Credit Foncier, 7 Ch. App. 161, would seem from the general statement of facts, to be much like the case now in hand. Company A loaned money to Company B. "Company B. had authority to borrow money, but not to buy up their own shares. Both companies were subsequently wound up. It was held that Company B was not affected by notice of any illegali-

ty in the purpose to which the money borrowed was to be applied, and that it was consequently entitled to prove against the estate of Company A under the winding up." As this question is not discussed in the majority opinion, I only refer to it here so that I may not be understood as assenting to the view which the court seems to have adopted without discussion.

In determining the rights of the parties respectively upon the facts found in this case, the first question would seem to be, did the transaction of January 20th create a legal and enforceable claim in favor of Deyette against the hardware company for the repayment of the money so loaned. Respondent claims and this court holds, that it did not, because the money was advanced knowing it was to be used for an illegal purpose, to wit, the purchase by the company of the Trask stock. The purchase of the stock, however, was not necessarily illegal. It would be legal if the stockholders all consented in writing. Comp. Laws, Sec. 2917. It is found that such consent was not obtained. It is not found that Deyette knew or had notice that it was not obtained. Was it required of him, in order to make his loan valid, to know or see to it that the purchase of the stock was made under such conditions as would make it a permissible and legal transaction? The money was loaned to accomplish a purpose that might be legal or it might be illegal, depending upon conditions not connected with the loaning of the money, but with the purchase of the stock. There are many cases holding that contracts made to actively aid in the violation of the law are unenforceable, and that money advanced and used for such a purpose cannot be recovered. The cases go upon the ground of guilty knowledge upon the part of the lender, making him in *pari delicto* with the immediate perpetrator of the wrong. But here there was no guilty knowledge on the part of Deyette, unless the law imputes it from the facts proved. It was not found that he loaned the money for the purpose of, or knowing that it was to be

used for, buying his stock under unlawful conditions.    All that the proved facts show upon this point is that he loaned the money to the company for the purpose of, and to be used in, buying this stock, and that he did not know that the consent of the stockholders had been or would be obtained, so as to make the purchase permissible, and such use of the money loaned lawful.    Respondent contends and our former opinion favors the thought, that as, under ordinary conditions and generally, the purchase of the stock would be in violation of the law, it was incumbent on Deyette to know that the conditions existed which would make the purchase allowable under the law.    I think this is going too far.    It is, in effect, presuming guilt from facts which are entirely consistent with innocence. The law punishes the lender by denying to him the right to enforce repayment, because he has knowingly participated in and willingly aided the violation of the law.    If, as is found in this case, this money was borrowed for the purpose of buying this stock, the borrowing preceded the actual purchase, and, if any presumption is charged against or credited to Deyette, it ought to be that the company would proceed in a lawful manner in effecting the purchase.    Suppose the traffic in intoxicating liquors is generally prohibited by law, and is only legal when the party so trafficking has first obtained a license therefor. A. applies to a bank for a loan of money to enable him to put in a stock of liquor for sale, and the bank makes the loan knowing the money is to be used for that purpose, is it therefore to be charged with the presumption that A. intended to engage in an illicit trade, instead of that he would do what was necessary to make his business legal?    It is against the policy of the state as announced in its constitution (Art. 17, Sec. 7) for a corporation "to take or hold any real estate, except such as may be necessary and proper for its legitimate business."

A bank or other party loans money to a corporation, knowing that it is to be used in the purchase of real estate. Must the loan contract be presumed to be invalid until the

lender establishes affirmatively that the real estate so pur-
chased was actually "necessary and proper" for the legitimate
business of the corporation?    There may be authorities so
holding, but I have found none.    The rule is that, the corpora-
tion proving authority to borrow money, it will be presumed
that it did it legitimately, and in the exercise of its corporate
powers.    4 Am. & Eng. Enc. Law, 222.    It would seem a freak
in logic to say that after a thing is done it will be presumed
that it was done regularly, but that before it is done it must be
presumed that it will be done irregularly.    The loan contract
was valid or invalid when made.    If invalid, it was because of
some knowledge, actual or imputed, upon the part of the
lender, that he was aiding and participating in a violation of
the law.    Such knowledge is the very essence of his wrong, and
ought in some way to be reasonably proved, rather than pre-
sumed, and that, too, against the established presumption that
men will not ordinarily do unlawful things.    The presumption
applies as well in civil as in criminal matters.    It will never be
presumed that the law has been or will be violated, but the
contrary will be presumed.    19 Am. & Eng. Enc. Law, 42.    If
this is a safe presumption for courts to rest their judgments
upon, it ought to be safe for individuals to act upon.    Suppose
in a proper judicial proceeding complaint were made that this
company was about to purchase shares of its own stock.    Would
not the court of whom relief was asked say at once it may le-
gally do so under certain conditions, and it cannot be presumed
against it that it will do it illegally?    If a court will presume
in its favor that it will act within the law, is there any good
reason why a stranger dealing with it may not indulge the
same presumption?

The findings in this case are entirely consistent with abso-
lute moral and legal innocence on the part of Deyette; entirely
consistent with an honest belief on his part, when he loaned
the money, that the consent of the stockholders had been or
would be obtained.    And a simple finding that it was not ob-

tained is quite insufficient, in my judgment, to charge him with a knowledge that the law was to be violated in the purchase of the stock. In his argument respondent assumes that Deyette was in the employ of the company, and must have had knowledge of what was and was not done, and therefore should be held to know that the Trask stock was bought without the consent of the stockholders being first obtained. There is nothing in the record showing that he had any relations with the company except that of creditor on account of this loan, except that included in the judgment confessed was $134 for work and labor. In what capacity this was performed is not shown or suggested. He might have been a clerk in the store, with some knowledge of its business and financial condition, or he might have been a drayman or laborer outside, with no knowledge of its affairs. We cannot presume either. We must get the facts from the record, and not from the briefs of counsel. I am unable to discover anything in the findings that militates against the validity of Deyette's claim. Placing this conclusion upon the ground that no guilty knowledge is found upon his part, furnishes an additional reason why it is unnecessary for me to discuss the mooted question of whether knowledge alone, if he had had it, that the stock was to be bought in violation of law, would, without participation by him in the unlawful transaction, other than loaning the money, be sufficient to render his loan contract invalid and unenforceable; and as, in the view I take of this case, this question is not involved, I reserve the expression of any opinion for future examination when presented. It follows that in my opinion the Deyette judgment in respect to its consideration was good and valid. This was the very question upon which the case turned in the trial court. It held the judgment invalid because the consideration was invalid. This is evident, not only from its conclusion of law upon this point, but from the fact that it held the judgment good as to the claim for services.

In our former opinion, now adhered to by a majority of the court, we went further, and said that the judgment ought not

to be enforced, because it was an effort on the part of an insolv-ent corporation to prefer Deyette as a creditor, and that an insolvent corporation could not do this. The same cause and the same reason would condemn the entire judgment, as well for services as for money loaned; but upon further reflection and a more thorough examination of the question I am unable to concur in the opinion that a corporation, by becoming insolvent merely, *ipso facto* loses its right to pay or secure one creditor in preference to another. We have declared the right of an individual debtor to make such preferences. Manufacturing Co. v. Max (S. D.) 58 N. W. 14. We said the right of a debtor to prefer one creditor over another was guarantied to him by the express words of the statute. Sec. 4654. A corporation or a partnership becomes a debtor under the same circumstances as an individual. If the so-called "trust-fund doctrine" will prevent a corporation debtor from so preferring one creditor to another, I am unable to see why it should not have the same effect, and for the same reason, in case of a partnership. A corporation becomes insolvent just when the partnership or the individual becomes so—when it is unable to pay its debts from its own means as they become due. Comp. Laws, § 4661. It is well, then, unless required by prevailing authority, to adopt the rule that a private corporation, unable to meet its debts as they mature, has no right to pay one creditor until or more than it pays all others? It is often said in the books that the assets of an insolvent corporation are a trust fund for the payment of its debts, but this is also true of a partnership, and really of an individual; and for the same reason. Pomeroy says this doctrine of trust is just as applicable to a partnership and its assets as to a corporation and its assets, and that in either case the relation can only be so named by way of "analogy or metaphor." He further says: "It is plain that no constructive trust can arise in favor of the creditors unless the partners or directors, through fraud or a breach of fiduciary duty, wrongfully appropriate the property and acquire the

legal title to it in their own names, and thus place it beyond
the reach of creditors through ordinary legal means." 2 Pom.
Eq. Jur. § 1046. If the rule of disability applies to an insol-
vent corporation on the ground of its trust relations to its
assets, it would seem that it should also apply to an insolvent
partnership; but in Manufacturing Co. v. Max, *supra,* we sus-
tained the right of Max & Baisch, an insolvent partnership, to
make such preferences. I cannot see why, in the case either
of a corporation or a partnership, the mere fact of insolvency,
without more, should of itself change the character of what
was the absolute property of the corporation or partnership
into trust funds. Insolvency creates a condition which justifies
a court with equity powers in laying hold of assets, and then so
treating and disposing of them. While the assets remain un-
disturbed in the hands of the corporation or partnership, sol-
vent or insolvent, it owns and may dispose of them as an indi-
vidual owner may, in any manner not fraudulent as to its cred-
itors, including stockholders in case of a corporation. Nearly
all commercial credit is given to the individual, the partner-
ship, or the corporation on the strength of its known assets,
and in reliance upon a prudent management and an honest
appropriation of them to the payment of its debts. In this
sense the property of every debtor is a trust fund, with himself
as trustee, for the payment of his debts. It is no more so sim-
ply because the debtor is a corporation, so long as it continues
its active functions as such, and retains absolute control of its
property. At no time does the trust attach to the property be-
cause it belongs to a corporation; but when the corporation
becomes insolvent and unable to continue its active life it is so
far civilly dead that its assets become subject to the adminis-
tration of the courts. From that time on the assets coming
into the hands of the court are treated as a trust fund for the
benefit of creditors and stockholders, for they then constitute
an estate to be administered. In Graham v. Railroad Co., 102
U. S. 148, the learned Judge BRADLEY said: "When a corpor-

ation becomes insolvent, it is so far civilly dead that its property may be administered as a trust for the benefit of its creditors and stockholders. A court of equity, at the instance of proper parties, will then make these funds trust funds, which are, in other circumstances as much the absolute property of the corporation as any man's property is his."

This trust doctrine, as applied to the assets of corporations, solvent and insolvent, was fully discussed by Judge BREWER in Hollins v. Iron Co., 154 U. S. 371, 14 Sup. Ct. 127, and the construction of the court is thus stated in the head note: "The expression often used, that the property of a corporation constitutes a 'trust fund' for its creditors, only means that when the corporation is insolvent, and a court of equity has possession of its assets for administration, such assets must be appropriated to the payment of its debts before any distribution to the stockholders, but, as between a corporation itself and its creditors, the former does not hold its property in trust, or subject to lien in favor of the creditors, in any other sense than does an individual debtor." In Van Alstyne v. Cook, 25 N. Y. 489, the court, in speaking of the assets of an insolvent, limited partnership, said: "They are trust funds when the courts of equity are properly appealed to in behalf of the partners, or any partner or creditor, to protect and distribute the same upon equitable principles, and on such application assert the control over them. They are not trust funds in the hands of the partners any more than ordinary partnership property." The supreme court of Illinois declares the same doctrine in Roseboom v. Whittaker, 132 Ill. 81, 23 N. E. 339: "The mere insolvency of a corporation cannot have the effect of depriving creditors of their legal remedies, but they are at liberty, notwithstanding the insolvency, to sue the corporation in an action at law, and by means of such proceeding establish a specific lien upon the property seized by attachment or execution. Such lien, when perfected, will doubtless entitle the creditor acquiring it to a preference over other unsecured creditors.

After the aid of a court of equity has been invoked, and that court has taken the assets of the insolvent into its hands, its jurisdiction becomes necessarily exclusive; and it will proceed, in administering the insolvent estate, upon the maxim that equality is equity." See, also, the later case of Peterson v. Tailoring Co., 150 Ill. 290, 37 N. E. 242. In Town v. Bank, 2 Doug. (Mich.) 530, it was held that a corporation has the same right to prefer one creditor over another that an individual has. This was followed in Kendall v. Bishop, 76 Mich. 634, 43 N. W. 645, and again in the recent case of Bank of Montreal v. E. J. Potts S. & L. Co., 90 Mich. 345, 51 N. W. 512, where it was held that "a corporation may, in the absence of legislative restriction, deal with its property precisely as an individual may, and may prefer one creditor over another; and hence its assets do not become a trust fund for *pro rata* distribution among all of its creditors, until steps are taken under the 'winding-up act.' " This "trust-fund" doctrine is luminously discussed by Judge MITCHELL in Hospes v. Car Co., 48 Minn. 174, 50 N. W. 1117, who demonstrates that, unless prohibited by statute, an insolvent corporation has the same right as an individual to prefer creditors, and that there is no solid foundation for the doctrine that the insolvency of a corporation has the effect of converting its assets into a "trust fund," in any proper sense of that term. In Ang. & A. Corp. 802, it is laid down as an unqualified proposition of law that "the mere insolvency of a corporation neither impairs its powers to manage its affairs nor converts its property into a trust fund for the benefit of its creditors." Almost precisely the same thing was said in Catlin v. Bank, 6 Conn. 233, and reiterated by the same court in Pondville Co. v. Clark, 25 Conn. 97. In the former case the court discussed the question at great length. In the course of its opinion, it says: "The cases of an individual and of a corporation in the matter under discussion, it appears to me, are not merely analogous, but identical, and I discover no reason for the slightest difference between them. * * * The insol-

vent banking corporation is just as much a trustee of the creditors, and no more, as the insolvent individual is the trustee of his creditors."

The same doctrine as to when the assets of an insolvent corporation become trust funds was declared by the supreme court of Missouri in La Grange Butter Tub Co. v. National Bank of Commerce, 26 S. W. 710. The court said: "In case of an insolvent corporation, a court of equity will make distribution of the corporation assets *pro rata* among the corporation creditors, and to that end will regard the corporation property as a trust fund. It is in this sense, and upon this principle, that the assets are trust funds. They are trust funds when a court of equity is appealed to in behalf of any member of the corporation or creditor to protect and distribute the assets upon equitable principles." And again in Alberger v. Bank, 123 Mo. 313, 27 S. W. 657, Judge BARCLAY, in speaking of the notion that insolvency transforms the assets of a corporation into a trust fund said: "This theory seems to have a singular fascination to some learned jurists, but, in our opinion, it is wholly untenable as applied to the facts of such a case as that before us, under the law of Missouri;" and, after a very thorough and instructive discussion of the question he concludes that "the creditor of a corporation has the same right to secure, by superior diligence or persistency, and to retain, a preference for his claim against a private corporation, that he would have were his debtor an individual engaged in the same line of business, provided, always, that the transaction is honest—that is to say, not a mere cover to a purpose to hinder, delay or defraud other creditors of the failing debtor." Such is also the declared law in New Jersey. In Wilkinson v. Bauerle, 41 N. J. Eq. 640, 7 Atl. 514, the court said: "If there be no legislative prohibition against the transfer of corporate property or its use in preferring creditors after insolvency, no reasons can be given why such transaction should be invalidated, which would not also invalidate the like transactions of

individuals.    Both reason and authority establish the proposi-
tion that a corporation may sell and transfer its property, and
may prefer its creditors, although it is insolvent, unless such
conduct is prohibited by law." The supreme court of Arkansas
in the recent case of Worthen v. Griffith, 59 Ark. 562, 28 S. W.
286, holds the same way, and that "it is only when a court of
equity, at the instance of a proper party, and in a proper pro-
ceeding, has taken possession of the assets of an insolvent cor-
poration, that its assets may, in this state, be properly said to
be a trust fund for its creditors." The same question as to the
right of an insolvent corporation to make preferences was be-
fore the court in Gould v. Railway Co., 52 Fed. 680. Judge
CALDWELL said that it was the settled law in Arkansas—from
which state the case came—that it might lawfully do so, and
added this significant statement: "The established rule in that
state is in harmony with the general, though not quite uniform,
current of authorities in this country on the question." After re-
ferring to a large number of supporting authorities he adds:
"The cases which hold the contrary doctrine are bottomed on the
erroneous theory that the insolvency of a corporation in effect
dissolves it, and makes the directors mere trustees to distribute
its assets ratably among its creditors. It is undoubtedly true
that the property of a corporation is, in one sense, a trust fund
for the payment of its debts; but this rule means no more than
that the property of a corporation cannot be distributed among
its stockholders, or applied to any purpose foreign to the legit-
imate business of the corporation, until its debts are paid.
The rule, so far as it relates to the payment of debts, is satis-
fied whenever the property of a corporation is applied to the
payment of its *bona fide* debts. The rule, as has been often
pointed out, does not prevent a corporation, whether solvent or
insolvent, from making preferences among its creditors, and
exercising in good faith absolute dominion over its property in
the conduct of its legitimate corporate business, so long as its
right to do so is not restrained by statute or by judicial pro-

ceedings." In his opinion Judge CALDWELL refers to the following authorities, none of which I have cited, as sustaining his conclusion: 2 Mor. Priv. Corp. 802; Allis v. Jones, 45 Fed. 148; Covert v. Rogers, 38 Mich. 363; Coats v. Donnell, 94 N. Y. 168; Dana v. Bank, 5 Watts & S. 223; Warner v. Mower, 11 Vt. 390; Whitwell v. Warner, 20 Vt. 426; Stratton v. Allen, 16 N. J. Eq. 229; Wilkinson v. Bauerle, 41 N. J. Eq. 635, 7 Atl. 514; Duncomb v. Railroad Co., 84 N. Y. 190, 88 N. Y. 1; Harts v. Brown, 77 Ill. 226; Reichwald v. Hotel Co. 106 Ill. 439; Buell v. Buckingham, 16 Iowa 214 (opinion by Judge DILLON); Garrett v. Plow Co., 70 Iowa 697, 29 N. W. 395; Smith v. Skeary, 47 Conn. 47; Bank v. Whittle, 78 Va. 737; Ashhurst's Appeal, 60 Pa. St. 314; Sargent v. Webster, 13 Metc. (Mass.) 497; Hallam v. Hotel Co., 56 Iowa 178, 9 N. W. 111.

The supreme court of Alabama is equally pronounced against this "trust-fund" doctrine, and in a very able and elaborate opinion, filed as recently as April of the present year, it expressly repudiates such doctrine, and overrules a number of cases in which its existence had been recognized by that court. The learned judge who writes the opinion says: "There is nothing clearer in principle than the proposition that the property of a corporation, solvent or insolvent, bears identically the same relations to the creditors of such corporation as the property of an individual or copartnership, solvent or insolvent, sustains to the creditors of the individual or partnership, and is or is not to be impressed with a trust character upon the circumstances and under the same conditions in the first case as in the latter two." Jewelry Co. v. Volfer, (Ala.) 17 South. 525. In the still more recent case of Thomson-Houston Electric Light Co. v. Henderson, Electric & Gaslight Co., 21 S. E. 951, the North Carolina supreme court deliberately rejected the "trust-fund" theory, and declared generally that the relation between a corporation creditor and the corporation, whether solvent or insolvent, is simply that of creditor and debtor, and that the

creditor had no equitable claim upon the corporation assets, either because it was a corporation or because it was insolvent. The supreme court of Indiana has lately made the same expression in emphatic terms in First Nat. Bank of Crawfordsville v. Dovetail, B. & G. Co., 40 N. E. 810, and in the same further held (bearing upon the first question discussed in this opinion) that "the fact that one lending money to a corporation knew that it was to be used by the directors for a purpose involving a breach of trust does not impair the validity of the judgment against the corporation in his favor for the amount loaned, entered by the corporation's consent, with the purpose of creating a preference." In Burrill, Assignm. (5th Ed.) Sec. 64, it is said: "It has been objected * * * that on the happening of its insolvency the corporation and its agents became trustees for the creditors, who where entitled to a ratable payment out of the trust fund in proportion to the amount of their debts. This position, however, has not been sustained, and apart from statutory provisions, no distinction exists between an individual and a corporation in regard to the exercise of the power of conferring preferences."

Without quoting from other cases, in which very wise and thoughtful judges have announced similar views, I am satisfied to say that to me they seem right in principle. If, for any reason, there should be a discrimination between different classes of debtors in respect to the right to make preferences among their creditors, as said by Judge DILLON in Buell v. Buckingham, *supra*, the rule should be declared by the legislature, which has the constitutional power to make and change the law, and not by the courts, which have no such power. It may be remarked, however, that as to some of the cases cited generally in support of the contrary doctrine they were controlled by local statutes which unfortunately are not mentioned, or at least not made prominent, in the opinion. For instance, both Ohio and Texas cases are cited as opposed, and Rouse v. Bank, 46 Ohio St. 493, 22 N. E. 293, and Lyons-Thomas Hard-

ware Co. v. Perry Stove Manuf'g Co., 86 Tex. 143, 24 S. W. 16, do so read, but in each state there was a statute declaring that any transfer of property as a preference by a debtor who is insolvent "or in contemplation of insolvency" shall not be valid as against an assignment then in contemplation for the benefit of creditors. What influence, if any, this declared policy of the state law had upon the treatment of the general question by the courts we do not know. I have read with interest what Mr. Thompson says upon this question in his recently published work on Corporations. He is an author of acknowledged learning and ability. Upon all matters he expresses his personal views positively and clearly, and usually courteously and dispassionately; but his treatment of this question, his characterization of the deliberately declared opinions of eminent courts and judges as "the mouthings of judges" with "low conceptions," "destitute of a sense of justice," and other similar flippancies, evince such a degree of morbidity upon this subject as greatly to compromise the value of his opinion. He says (Sec. 6496) the "fallacy" of the conclusion to which these thoughtless judges have "jumped" is in overlooking "the fact that the analogy between an individual and an insolvent corporation wholly fails in this: that although an insolvent individual may turn over his property to certain of his creditors whom he desires to prefer, and may, by so doing, hinder and delay the others, yet he merely delays and hinders them; he does not, by that act, destroy himself; he still lives; and he may, and often does, get on his feet again, and acquire property, and discharge his previous obligations. But when a corporation becomes insolvent, and ceases to have the means of carrying out the object of its creation, and dispossesses itself of all its property, it destroys itself, and becomes *ipso facto* dissolved." In his zeal to demonstrate the "fallacy," has not the learned author allowed himself to start from unstable premises? Is it entirely safe to build upon the foundation that when a corporation becomes insolvent, "and dispossesses itself of all its

property, it destroys itself, and becomes *ipso facto* dissolved?"
In Sec. 6483 of the same book he has told us that "the as-
signment by a corporation of all its property for the benefit of
its creditors does not extinguish it as a corporation, or disable
it from maintaining an action, unless the subject-matter of the
action passed from it by the assignment." In this latter state-
ment he seems well supported by authority, though Judge
STORY, in a dissenting opinion in Beaston v. Bank, 12 Pet. 138,
intimated a contrary opinion. See Burrill, Assignm. (5th Ed.)
Sec. 64; Ang. & A. Corp. Sec. 770; and cases cited by each of
these authors. The law is generally recognized to be, as stated
by Mr. Thompson, that neither the insolvency of nor a general
assignment by a private corporation works its dissolution. An
individual debtor, stripped of his means for satisfying his debts,
"still lives"; but it is just as true of a corporation. Each is
still a living debtor without present ability to pay his or its
debts. It is probably true that an individual debtor is more
likely to "get on his feet again," but that is incidental merely,
and does not prove or tend to prove any difference in their le-
gal status. The possession of property is no more essential to
the existence of a corporation than it is to the existence of a
man. If a corporation becomes insolvent, there is nothing to
prevent its members, until its dissolution is legally declared,
from furnishing more funds, and proceeding to use its corpor-
ate powers. Mor. Priv. Corp. Sec. 1010, and citations. My
conclusion is that the hardware company, although insolvent,
might legally prefer Deyette as a creditor, and that his judg-
ment, founded on a good consideration, was not invalid or un-
enforceable on account of such preference.

As to Lewis and his judgment, the facts established by
the findings are the same, except that at the date of his judg-
ment and before—but how long before is not found—he was a
director and secretary of the company. He, too, loaned money
to the company for the purpose of buying the Trask stock and
it not being shown that at the time of such loaning and pur-

chase he had any connection with the company, he, as a creditor, would stand upon the same footing as Deyette, except that when his judgment was confessed he was a director and officer of the company. On the 9th day of May the company confessed these judgments—one to Deyette, already considered; one to Foster, over which there seems to be no controversy; and one to Lewis, now in hand. Lewis himself executed these confessions as secretary of the company. Executions were issued on these judgments, and levied upon the personal property of the hardware company, but when issued or when levied does not appear. On the 12th, execution was also issued on respondent's judgment. The property was sold, and the proceeds which are "not sufficient to pay the judgments against the Hicks-Trask Hardware Company prior to the judgment of plaintiff" (respondent), are held by the sheriff "to be applied on said executions according to the decree of this court." It not appearing that executions were issued on other judgments than those named, we understand from the language of the findings that the proceeds are insufficient to pay the three judgments first named. The Foster and the Deyette judgments being good, and entitled to be paid; the contest is over the balance in the hands of the sheriff, and between Lewis and the respondent. While the findings do not expressly show—as we wish they did—when the execution on the Lewis judgment was issued or levied, it must have been prior to the issuance of respondent's execution, for the property appears to have been sold under the Lewis, Foster and Deyette executions. The fact that the company was insolvent, that it confessed these three judgments on the 9th, and that three days thereafter it confessed judgment to quite a number of other creditors, including respondent, and that executions were issued and levied on the first three judgments either prior to or on the 12th, the date of the subsequent judgments, and before respondent's execution, issued immediately upon obtaining its judgment, is very convincing, though perhaps not incontestible, evidence that it

was intended that Foster, Lewis and Deyette should be given a preference over other creditors.  I have no doubt that it was so designed.  So that the question now in hand is, could the company legally prefer Lewis, a director, and one of its managing officers, on account of an indebtedness not contracted on the strength of such preference, but for a general antecedent indebtedness?  I think that we can hold that it could not, consistently with what I have already said in respect to the right generally of an insolvent corporation to prefer creditors. While the directors and officers of a corporation, solvent or insolvent, are not in any proper sense the trustees of the creditors, they do occupy a relation to them demanding the utmost good faith on their part in the handling of the corporation assets.   To their honest and fair dealing with the property, and to their just and prudent management of the business, the creditors must look for their continued security,   As in the case of others occupying a fiduciary position, they cannot innocently sacrifice the interests of those who trust them to their own personal advantage..  As managers of the corporation and its property, they owe a duty to those dealing with them, which they violate when, to the detriment of those who confide in them, they make themselves preferred beneficiaries in the disposition of assets which without such preference, would be available alike to all creditors.   They hold in their hands the property of the corporation to which creditors must look for satisfaction of their claims, and come within the just principal that one who has possession and control of property for the benefit of others besides himself may not dispose of it for his own special advantage, to the injury of others, for whom it is also held.

The judgment in this case was confessed.   Lewis himself as secretary of the company executed the confession to himself. It was not a hostile proceeding against the company in which he acted as a creditor only, but was a voluntary effort on the part of the company, executed through and by him as its secretary, to give himself an advantage over creditors generally,

with no equities to justify such preference, except that he was a general creditor on account of an antecedent indebtedness. I do not think such a preference should be sustained.

In many of the states which recognize the general right of an insolvent corporation to make preferences among its creditors, such preferences in favor of its own directors on account of antecedent indebtedness, in the absence of special equities, are not sustained. See Gottlieb v. Miller, 154 Ill. 44, 39 N. E. 992, where a preference was sustained as to outside creditors, and set aside as to directors. See, also, Lippincott v. Carriage Co., 25 Fed. 577, where a large number of cases are cited to the point that directors and managing officers cannot be preferred. Montgomery v. Phillips (N. J. Err. & App.) 31 Atl. 622, followed in Mallory v. Kirkpatrick (N. J. Ch.) 33 Atl. 205; Henderson v. Trust Co. (Ind. Sup.) 40 N. E. 516; Corey v. Wadsworth (Ala.) 11 South. 350. See, also, upon this a valuable note to Lyons-Thomas Hardware Co. v. Perry Stove Manuf'g Co. (Tex. Sup.) in 22 Lawy. Rep. Ann. 802, 24 S. W. 16, in which the editor's conclusion is thus stated: "On examination of the decisions, it is clear that the weight of authority is overwhelmingly in favor of the legality of preferences to ordinary creditors, except as restricted by statute, and overwhelmingly against the validity of such preferences when made in favor of directors."

The trial court held the Lewis judgment invalid, both because of the invalidity of its consideration and because it was the result of an attempt to give preference to a director. For reasons stated early in this opinion, I think the first ground untenable. As to the second ground, I am of the opinion that he, being a director, and one of the managing officers of the company, ought not to get any advantage in the nature of a preference, but that the court was wrong in holding his judgment void and in denying him participation in the distribution of the proceeds of sale in the hands of the sheriff. This seems to be the policy of our statute. If, by a general assignment,

this preference had been attempted in favor of Lewis, the preference would have failed, but he would still have been entitled to share ratably with other creditors. Comp. Laws, § 4660. I think there is much in the majority opinion that is sentimentally good and wholesome, but that the text from which it is elaborated cannot be found anywhere in the facts returned by the trial court, or of which we have any judicial knowledge.

Finally, I cannot quite understand how the court, having deliberately declared that the assets of this corporation, being insolvent, constitute a fund for ratable distribution among its creditors without preference, can affirm this judgment, which gives to this respondent creditor practically the entire assets of the corporation, in the face of the record showing other creditors, whose judgments were confessed at the same time, and which must go unpaid. This is an equitable action in the nature of a creditors' bill in behalf of this plaintiff only, and the remark of Judge THAYER in Walker v. Miller, 59 Fed. 871, seems pertinent: ''If this trust-fund theory is to be adopted to prevent the corporation from granting a preference because of its insolvency, we know of no reason why it should not be invoked to keep attaching creditors at bay, and thus relegate the disposal of the fund, so far as judicial proceedings are concerned, to a court of equity.'' See, also, Mallory v. Kirkpatrick, *supra*.