ERICKSON-HELLEKSON-VYE COMPANY AND ANOTHER v.
A. WELLS COMPANY AND OTHERS.
MARGARET WELLS GROSCHÉ AND OTHERS,
APPELLANTS.[1]

May 12, 1944.

No. 33,538.

[1]Reported in 15 N. W. (2d) 162, 459.

362

*Harry W. Oehler,* for appellants.
*Murphy, Johanson & Winter,* for plaintiffs-respondents.
*F. C. Anderson,* for respondent A. Wells Company.

STREISSGUTH, JUSTICE.

After considerable pretrial maneuvering and skirmishing, the de-

tails of which are unimportant here, this action was brought on for trial with the parties alligned and battling for objectives as follows:

A. Erickson-Hellekson-Vye Company, the original plaintiff, sought judgment against A. Wells Company, the corporate defendant, and its stockholders for an unpaid balance due plaintiff for a heating plant, hardware, and other building materials furnished to and used by the corporation in remodeling and repairing a store building owned by it. Plaintiff attacked as fraudulent an $18,000 mortgage dated August 11, 1936, and an assignment of rents dated August 15, 1936, given by the defendant corporation to its stockholder and codefendant Emma B. Wells and by her assigned to her daughters and codefendants Grosché, Van Spall, and Williams; sought to have an attempted foreclosure of the mortgage enjoined; and asked that a receiver be appointed to take possession of the mortgaged real estate.

B. L. P. Dolliff Lumber Company, originally sued as a defendant but later converted into a coplaintiff, likewise sought recovery against the corporate defendant and its stockholders for a bill of materials which it had sold and delivered to the corporate defendant and which was used in remodeling and repairing the store building. The impleaded plaintiff joined in the allegations of the original complaint and asked for the same equitable relief.

C. The corporate defendant admitted its indebtedness to plaintiff and to the impleaded plaintiff and joined with the plaintiff in asking equitable relief in respect to the $18,000 mortgage and the assignment of rents. By cross-bill, this defendant sought recovery from its codefendants and stockholders Grosché, Van Spall, and Williams, heirs of Alpheus Wells, in the sum of $4,908 for corporate funds paid to the Wells estate as "fictitious" corporate profits, and in the further sum of $15,750 for corporate funds used in paying the Wells heirs for corporate stock purchased by defendant Thomas K. Ranney and one Leslie O. Davidson.

D. Defendants Thomas K. Ranney and Ruth M. Ranney, stockholders of the A. Wells Company, likewise admitted the claims of the two plaintiffs and joined with them in asking equitable relief

in respect to the $18,000 mortgage and the assignment of rents. These defendants, by cross-bill, asked judgment in favor of the A. Wells Company and against defendants Grosché, Van Spall, and Williams for the two items of $4,908 and $15,750, and also sought judgment for $8,000 in their own favor against such codefendants because of the stock purchase transaction.

E.    Defendant Fred F. Ranney pleaded the general issue.

F.    Defendants Margaret Wells Grosché, Lucille Wells Van Spall, Edyth Wells Williams, and Emma B. Wells, former stockholders of the A. Wells Company and holders of the mortgage under attack, by separate but identical answers, contested the right to any relief of plaintiffs and the defendants filing cross-bills. These answers are too lengthy to justify analysis here, but the separate defenses pleaded will be referred to during the course of the opinion.

Pursuant to the findings made by the court, judgment was entered in favor of the plaintiff, Erickson-Hellekson-Vye Company, against the A. Wells Company for $1,235.20, with costs, and in favor of the impleaded plaintiff, L. P. Dolliff Lumber Company, against the A. Wells Company for $619.70. This judgment was made a lien and charge upon lots 27 and 28, block 3, of the village of Wheaton, for the improvement and repair of which plaintiffs' materials had been used, superior to any right or lien of any of the defendants. The $18,000 mortgage and the assignment of rents were set aside, vacated, and annulled to the extent necessary to satisfy and discharge the judgment of the two plaintiffs.

Judgment was further entered, pursuant to the findings, in favor of the A. Wells Company, cancelling and setting aside the $18,000 note and mortgage and the assignment of rents. The judgment also cancelled and set aside a $17,000 mortgage executed on January 4, 1928, by the corporation in favor of the executors and trustees under the last will of Alpheus Wells, deceased, and his heirs, as mortgagees, as well as a $27,000 mortgage executed by the corporation on September 1, 1933, in favor of the same parties, as mortgagees. A money judgment was entered in favor of the defendant A. Wells Company against the defendants Grosché, Van

Spall, Williams, and Wells in the sum of $16,784.74 with interest, and the lien of said judgment was impressed upon 232 shares of stock in the A. Wells Company, registered in the name of defendants Thomas K. Ranney and Ruth M. Ranney, which shares were ordered restored to said defendants Grosché, Van Spall, Williams, and Wells upon payment of the judgment. These four defendants were also directed by the judgment to surrender eight promissory notes of $50 each delivered by A. Wells Company to defendant Emma B. Wells, and said notes were ordered cancelled, set aside, and annulled. Finally, the judgment provided for a receivership of defendant corporation and permanently restrained defendants Grosché, Van Spall, Williams, and Wells from foreclosing the $18,000 mortgage and from continuing to collect any of the rents, income, or profits of the mortgaged real estate.

Defendants Grosché, Van Spall, Williams, and Wells are the only appellants.

The defendant A. Wells Company is a South Dakota corporation organized about 1901. Its principal stockholder up to the time of his death in 1924 was Alpheus Wells, the husband of defendant Emma B. Wells and the father of defendants Margaret Wells Grosché, Lucille Wells Van Spall, and Edyth Wells Williams. At the time of his death, Wells owned 232 shares of the corporate stock out of a total of 398 shares outstanding. By his will, this stock was bequeathed in trust to his widow and his three daughters. The other stockholders at the time of Wells' death were A. O. Malmgren, Oscar J. Davidson (a brother-in-law of Wells), Edward G. Olson, and William H. Damon. A. S. Grosché, a son-in-law of Wells, succeeded him as president. To qualify Grosché as such officer, one of the 232 shares had been transferred to him; the other 231 shares were held in trust for the Wells heirs.

While for many years after its organization in 1901 the A. Wells Company engaged in many and varied activities extending generally over western Minnesota, in 1921 its business had become localized at Wheaton, where it owned a two-story brick building, in which it conducted a general retail mercantile store as well as an under-

taking establishment, and other real estate. The company did not prosper from 1921 to 1929, with the result that in 1929 its officers and stockholders decided to discontinue its mercantile business and rent its store building. Accordingly, the entire stock of merchandise was sold and the store building remodeled. The building is 50 feet wide and 100 feet long with a full basement, and, up to 1929, its heating system serviced the first floor only. The second floor, prior to 1929, was used exclusively as a lodge hall, was heated with individual stoves, and brought an income of not to exceed $100 a year. The remodeling consisted in dividing the first floor so as to make two 25-foot stores and in converting the second floor into eight living apartments. This necessitated a new heating system, furnace and boiler, plumbing equipment and fixtures, as well as a large quantity of building material. Following the alterations and remodeling, one of the stores was rented for $125 and the other for $150 per month. The income from the second story was increased from about $100 per year to more than $200 per month.

Plaintiff, Erickson-Hellekson-Vye Company, furnished the heating system and much of the building material for the new improvement. All the items for which it sought recovery were used in the improvement and repair of the property. The date of the first item in its account is August 1, 1929, while other items appear from year to year continuously up to and including November 10, 1937. The materials sold and delivered by the impleaded plaintiff, L. P. Dolliff Lumber Company, were likewise used in the improvement and repair of the building from 1928 to 1939.

On October 31, 1927, and prior to the making of the improvements, the executors and trustees under the Wells will and the widow and daughters of Wells had entered into a contract with Leslie O. Davidson and Thomas K. Ranney for the sale to Davidson and Ranney of the 232 shares of stock owned by the Wells heirs. Leslie O. Davidson is the son of Oscar J. Davidson, who had been the general manager of the Wells company from 1901 until 1926, its secretary-treasurer from 1901 to 1925, and its vice-president from 1925 until he died in 1928 or 1929. During the entire period, Oscar

J. Davidson owned 74 shares of stock. Leslie O. Davidson had worked for the company prior to his father's death and was elected its secretary-treasurer on January 7, 1925. On August 2, 1927, Oscar J. Davidson assigned to Leslie O. Davidson 73 shares of stock. Thomas K. Ranney had been employed in the grocery department of the Wells company since 1923. He had no stock of record until January 4, 1928, when Leslie O. Davidson assigned four shares to him. Leslie O. Davidson and Ranney had been general managers of the company's store continuously for several years prior to the sale of the merchandise stock in 1929. Thomas K. Ranney and Ruth M. Ranney are husband and wife. Between March 5, 1930, and September 1, 1933, they acquired from Leslie O. Davidson the balance of the 166 shares of stock owned outside the Wells family, which they have continued to hold except for one share issued to S. C. Odenborg to qualify him for a directorship.

This stock-purchase agreement referred, by way of preface, to a $17,000 indebtedness of the A. Wells Company to Alpheus Wells, to a $2,500 indebtedness of Oscar J. Davidson to Alpheus Wells, and to the then ownership of corporate stock of the par value of $23,200 (232 shares) by the executors and trustees, with the ultimate and beneficial interest therein in the widow and daughters of Alpheus Wells. The trustees, widow, and daughters agreed to sell the 232 shares of stock to Leslie O. Davidson and Thomas K. Ranney for $25,700[2], $2,500 to be paid in cash and the balance in installments, the last of which was to become due on February 1, 1935. The agreement provided that upon payment of the second installment of $7,500 due on February 1, 1928, 32 shares of stock were to be delivered to the purchasers, while the remaining 200 shares were to be delivered on payment of the full purchase price, title to remain in the sellers until full payment should be made. It was also agreed that as long as the purchasers continued to make their payments according to their contract and to conduct the cor-

[2]The purchase price of $25,700 was arrived at by adding $2,500, the amount of the indebtedness of Oscar J. Davidson to Alpheus Wells, to the par value of the stock.

poration's business in a good, businesslike manner they should be continued in the management of the business. The agreement further provided for a ten-year mortgage by the corporation to the executors, trustees, and heirs, in the sum of $17,000, to secure the indebtedness of the company to Alpheus Wells. Such mortgage was actually executed on January 4, 1928. The two installments of $2,500 and $7,500 on the stock-purchase contract were paid with corporate funds on the dates fixed, as were two interest installments on the mortgage falling due on July 1, 1928, and July 1, 1929, amounting respectively to $425 and $1,020.

On May 27, 1930, an agreement, referred to as a "subordination" and as a "custodian" agreement, was entered into between the A. Wells Company, as first party; Emma B. Wells, trustee, owner of 232 shares of the company's stock, as second party; Thomas K. Ranney, then owning the balance or 176 shares of outstanding stock, as third party; and Andrew Peterson[3], as fourth party. The agreement recited the facts leading up to the 1927 stock-purchase agreement and continued it in effect, and specifically recognized the company's indebtedness of $17,000 and interest to the Wells heirs, as well as the mortgage executed on January 4, 1928, and provided that Thomas K. Ranney was employed (a) to collect, receive, and receipt for all moneys now due to the company; (b) *to make such alterations, improvements, and repairs to any of the buildings as in the judgment of the board of directors of the company may be desirable in order to place and keep said real estate in tenantable condition, and to pay the cost thereof out of moneys furnished to him by the company;* (c) to attend to the renting of said premises, the collection of rents and income, and in all respects to manage and act as custodian thereof, and to operate the heating plant and pay the cost and expense of maintenance and operation thereof and of repairs to the buildings; (d) to conduct the company's mortuary business and receive the proceeds and receipts thereof and pay the obligations and expenses incident thereto. The net receipts,

[3]Peterson was a creditor of Thomas K. Ranney and the holder of 132 shares of stock under a pledge since redeemed.

*after payment of the expenses, charges, obligations, and disbursements so mentioned,* were to be distributed (e) to the payment of taxes and insurance of said property, interest upon the encumbrances thereon, and *the cost of necessary repairs and upkeep.* Any surplus was to be prorated among the stockholders or their creditors.

Between the time of the execution of the 1930 agreement and June 19, 1933, the A. Wells Company continued to make interest payments on the $17,000 mortgage. In 1933, that mortgage was the subject of renegotiation. Considerable correspondence was exchanged between the attorneys representing the corporation and the two groups of stockholders, which finally culminated in a third agreement dated September 1, 1933, between Emma B. Wells as trustee for the Wells heirs, the corporation, and Thomas K. Ranney. The agreement recited that it was to "supplant, replace and supersede any and all agreements heretofore made * * * and * * * specifically * * * that certain agreement dated May 27, 1930, * * * and that certain agreement dated October 21, 1927," and specifically referred to and recognized the $17,000 corporate mortgage executed on January 4, 1928, "on which said mortgage there is approximately * * * $3,000 due in interest." The new agreement provided that (a) the trustee should assign and deliver to Ranney the 232 shares of stock described in the 1927 agreement and all other stock that the trustee might own and hold; (b) the company should execute and deliver to the trustee a first mortgage for $27,000 secured upon the corporate real estate in Wheaton, said sum to be paid in monthly installments of $180 with certain exceptions not material here; (c) when the principal sum of said mortgage was reduced by $3,000, the trustee, upon payment to her of an additional $2,000, agreed to release from the mortgage that part of the real estate occupied by a mortuary; (d) the corporation would call a meeting of its board of directors and pass a resolution authorizing execution and delivery of the $27,000 mortgage to the trustee.

On September 1, 1933, the same date the contract bears, a $27,000 note and mortgage were executed by the corporation. On Septem-

ber 4, 1933, the remaining 200 shares held by the Wells heirs and not previously delivered were surrendered, ordered cancelled, and a new certificate issued to Ruth M. Ranney as her husband's nominee. Since that date Thomas K. Ranney and Ruth M. Ranney have held all the outstanding corporate stock. On November 6, 1933, the $17,000 mortgage was satisfied.

Between 1933 and August 17, 1936, $3,567.50 was paid by the A. Wells Company to the Wells heirs. On August 17, 1936, a new note and mortgage for $18,000 were executed in favor of Emma B. Wells in renewal of the balance due on the $27,000 mortgage, which had been satisfied of record on July 27, 1936. (Apparently the Wells heirs voluntarily gave a credit of $9,000 on the principal.) Executed as a part of the same transaction, though dated August 15, 1936, was an agreement whereby the company assigned to the mortgagee "all the rents, issues, and profits now due and which may hereinafter become due" from the letting of the company's real estate, with power to use and apply the same to the payment of the $18,000 mortgage note and to the payment of expenses in the care and management of the property. Between September 8, 1936, and October 3, 1938, the corporation made payments on the mortgage totaling $2,850 and delivered eight separate notes to the Wells heirs of $50 each.

The three contracts which we have reviewed, executed by the corporation in 1927, 1930, and 1933, as well as the $17,000 mortgage executed in 1928, the $27,000 mortgage executed in 1933, the $18,000 mortgage executed in renewal thereof in 1936, and the assignment of rents executed in 1936, are attacked by the plaintiffs, as creditors, and by the A. Wells Company and Thomas K. and Ruth M. Ranney, its sole stockholders of record, on several grounds: (1) The mortgages, insofar as they purport to evidence and secure an indebtedness from the A. Wells Company to Alpheus Wells and his heirs, are asserted to be without consideration and fraudulent as to both creditors and stockholders; (2) the several stock-purchase agreements whereby the corporate property and funds are pledged as security for the payment of the purchase price of 232 shares of

corporate stock are claimed to be *ultra vires;* and (3) the assignment of rents to the mortgagee for application upon the $18,000 mortgage is alleged to be null and void as an attempt to give the mortgagee possession of the mortgaged premises without foreclosure.

The A. Wells Company being a South Dakota corporation, the rights and obligations of its stockholders are fixed and determined by the laws of that state. Woodward v. Sonnesyn, 162 Minn. 397, 203 N. W. 221. Likewise, the law of South Dakota must determine the *ultra vires* character of the several transactions under attack. 23 Am. Jur., Foreign Corporations, § 81. However, it is not every law of the state of origin which follows a corporation into other jurisdictions and affects its capacities there.

"* * * A distinction is usually observed between laws which become part of its charter and those which merely regulate the business or transactions of corporations in the state generally. As a general rule, only the charter and the restrictions and prohibitions contained therein, or in the laws of the state of origin in relation thereto, follow the corporation into another state and are recognized and enforced there under the rules of comity." 23 Am. Jur., Foreign Corporations, § 82; Guilford v. Western Union Tel. Co. 59 Minn. 332, 61 N. W. 324, 50 A. S. R. 407.

So, it is not the *lex domicilii* but the *lex locus contractus* which ordinarily determines contract rights between a corporation and its creditors; and questions of preferential and fraudulent transfers of real estate are determined by the *lex rei sitae.* Restatement, Conflict of Laws, § 218(f) ; 9 ULA, Fraudulent Conveyance Act, p. 329; 1 Dunnell, Dig. & Supp. § 1534. Both South Dakota and Minnesota having adopted the Uniform Fraudulent Conveyance Act, that feature of the case presents no special difficulties, except as there may be some difference in the interpretations of that law by the courts of the two states.

So far as the two plaintiffs are concerned, their claims having arisen subsequent to the execution and delivery of the 1927 mortgage, they are in no position to attack it as preferential, if the in-

debtedness to Alpheus Wells, thereby secured, was *bona fide*. Larson v. Tweten, 185 Minn. 366, 241 N. W. 43.

■ However, the right of plaintiffs here to priority over the mortgages to the Wells heirs does not depend upon the application of any of the provisions of the Uniform Fraudulent Conveyance Act. Nor does such right depend upon the application of the "trust fund" theory of corporate property recognized by the courts of South Dakota but not by those of Minnesota. 15A Fletcher, Cyc. Corp. (Perm. ed.) § 7385; 2 Dunnell, Dig. & Supp. § 2033. By the express terms of the 1930 contract, Thomas K. Ranney, as manager of the defendant corporation, was authorized and employed to make alterations, improvements, and repairs to the mortgaged premises and to pay the cost thereof out of moneys furnished him by the corporation. Moneys received by him out of rentals were to be used in payment of such expenses and charges and then applied to the payment of taxes, insurance, and interest upon the mortgages. The agreement will bear no other construction than that all parties thereto intended that any expense incurred in the alteration, improvement, and repair of the mortgaged premises should be a prior claim upon the rentals received therefrom and that the mortgage indebtedness should be subordinated thereto. Both as a matter of legal right and as a matter of equity, the trial court had no alternative but to recognize the validity of the claims of the two plaintiffs, to make the claims liens and charges upon the corporate property superior to the lien of the last or $18,000 mortgage, and to grant injunctive relief against the foreclosure of the mortgage until the plaintiffs' claims were paid.

■ The cross-complaints of the A. Wells Company and Thomas K. Ranney and Ruth M. Ranney, his wife, however, stand on an entirely different footing. In determining their rights, it must be kept in mind that no rights of creditors other than plaintiffs are involved; that since 1933 the Ranneys have been the only stockholders of the A. Wells Company; also that Thomas K. Ranney and Leslie O. Davidson, who contracted with the Wells heirs for the purchase of 232 shares of stock in 1927 and again in 1930 and 1933, did so

with full knowledge or opportunity to know the exact status of the corporate finances and affairs. They were at the time dealing with the Wells heirs at arm's length with a view to acquiring all the outstanding corporate stock, and they were willing that the corporation, the whole of whose stock they would eventually own, should give security upon its property and divert its funds to the payment of an obligation which otherwise would be theirs personally.

The trust fund doctrine of corporate property is of no avail to the Ranneys, who are not creditors but stockholders of the Wells company. That doctrine unquestionably prevents a corporate officer from preferring himself as a creditor over the general corporate creditors. Adams & Westlake Co. v. Deyette, 5 S. D. 418, 59 N. W. 214, 49 A. S. R. 887; Rowe v. Leuthold, 101 Wis. 242, 77 N. W. 153. While committed to the rule that a corporation cannot transfer its money or property to one creditor, be he also a director or not, so as to prefer him over others in the same class, the South Dakota court has held that the corporate trust fund is not "a true and complete trust, in every sense of the word and for all purposes." Smith v. McCowan, 60 S. D. 504, 507, 244 N. W. 891, 892. Corporate property of a South Dakota corporation is not held in trust in any proper sense of the term as applying to estates or interests, one equitable and one legal, one person as trustee holding the legal title and the other, as *cestui que* trusts, the beneficial interest.

"* * * The whole doctrine * * * rests upon the equitable consideration that the distribution of the capital among stockholders without making adequate provision for the payment of debts, or the issue of fictitiously paid-up stock, is a fraud upon creditors who contract with the corporation in reliance upon its capital remaining intact, or in reliance upon the professed capital having been in fact paid up in full. But when the reason for the rule does not exist the rule itself ceases to apply." First Nat. Bank v. Gustin Minerva Consol. Min. Co. 42 Minn. 327, 332, 44 N. W. 198, 200, 6 L. R. A. 676, 18 A. S. R. 510; 15A Fletcher, Cyc. Corp. (Perm. ed.) § 7374.

The court in that case pointed out that even as to creditors the trust is not enforced where they acted "with full knowledge of the

facts." *A fortiori*, the trust fund doctrine cannot avail minority stockholders where they and their predecessors in interest were fully cognizant of the whole arrrangement under which the property of the corporation was mortgaged, and acquiesced not only in the original agreement but in renewals and novations thereof, with full knowledge of the facts.

■ Though the trial court found that there was no consideration for the $17,000 mortgage executed pursuant to the 1927 contract, the records of the corporation indicate the contrary. As early as 1920, an indebtedness of the Wells company to Alpheus Wells in the sum of $16,467.30 was carried on its balance sheet under "Bills Payable." This same debt, though in slightly varying amounts, is also shown on subsequent balance sheets for the years 1921 to 1929. The company's financial statement for 1920 also showed that the Wells company was then indebted to Oscar J. Davidson in the sum of $1,526.46 and to A. O. Malmgren, another stockholder, in the sum of $437.20. The existence and validity of these items of indebtedness were never questioned by the managing officers of the company nor by any of its stockholders until the present action was commenced.

The burden of proving want of consideration is generally on the party who asserts it, especially where the debt is evidenced by a negotiable instrument. 1 Dunnell, Dig. & Supp. § 1040; Veigel v. Johnson, 163 Minn. 288, 204 N. W. 36; McIntyre v. Peterson, 210 Minn. 419, 298 N. W. 713. There is no evidence in the record to establish that the $17,000 note and mortgage were given for less than the consideration they recited.

■ The Ranneys, on behalf of themselves and the corporation, argue that the 1933 agreement was executed "under coercion and by reason of the influence and threats exercised by the Wells heirs by reason of their majority stock ownership." There is, however, no evidence of such coercion or duress as to justify any court in setting aside the agreement on that ground. The preliminary negotiations covered a period of months and were carried on mainly by correspondence between attorneys for the respective parties. Re-

liance is placed upon a letter dated July 3, 1933, written by an attorney for the heirs outlining their proposal and stating: "if this proposition is not accepted, or substantially so, it is our purpose to call a special meeting of the stockholders and to replace Mr. Ranney as manager * * *. It will be our further purpose to proceed to elect a new Board of Directors, as we still have the controlling stock." In a subsequent letter dated August 11, 1933, the attorney wrote: "I am afraid that you will have to deliver the final ultimatum or proposition that the payments will have to start on September 1 and if it is going to be difficult for the corporation to do so, they will have to readjust their finances or rearrange with their creditors to permit the commencement of these payments." There is a further statement in a letter dated August 17, 1933: "Mr. Ranney should understand that they [the heirs] represent the majority stockholders of the A. Wells Company so that we may obtain complete control of the corporation without very much difficulty." In another letter dated August 21, 1933, the attorney wrote: "I also enclose form of the resolution which I would also like to have adopted, together with the proposed mortgage, which please have executed as soon as the resolution has been passed and return to the writer." These statements, singly or in combination, fall far short of showing such coercion or duress as to nullify the subsequent agreement executed by the Ranneys for themselves and in behalf of the corporation.

"The law does not recognize duress by mere suggestion, advice; or persuasion, especially where the parties are at arm's length and represent opposing interests." Clement v. Buckley Merc. Co. 172 Mich. 243, 253, 137 N. W. 657, 660. "To constitute duress there must be such constraint as substantially takes away free agency." Malmquist v. McChord, 179 Minn. 17, 228 N. W. 167. "The one asserting it must have been subjected to a pressure which overcame his will and coerced him to comply with demands to which he would not have yielded if he had been acting as a free agent. In other words, the pressure must be such as to destroy the genuineness of the contractual consent." General Motors Acceptance Corp. v.

Jobe, 188 Minn. 598, 601, 248 N. W. 213, 214; Clement v. Buckley Merc. Co. *supra;* Steblay v. Johnson, 194 Minn. 352, 260 N. W. 364; 2 Dunnell, Dig. & Supp. §§ 1813a, 2848. "Duress will not prevail to invalidate a contract entered into with full knowledge of all of the facts, with ample time and opportunity for investigation, consideration, consultation and reflection." American Nat. Bank v. Helling, 161 Minn. 504, 511, 202 N. W. 20, 23; Zimmermann v. Benz, 162 Minn. 47, 202 N. W. 272; 2 Dunnell, Dig. & Supp. § 1813a.

In view of these well-accepted rules and tests, the alleged coercion of the Ranneys and the corporation in the execution of this agreement must necessarily be disregarded.

■ Nor is this a case where the parties can invoke the rule that corporate officers owe the corporation and its stockholders the active duty of honesty and good faith, since the Wells heirs, though owning the majority of the corporate stock, were not its managing officers or directors. Since 1927, at least, their only representative on the board of directors or staff of officers has been A. S. Grosché; the other officers and directors have been Ranney and other members of the minority group. See Green v. National A. & A. Co. 137 Minn. 65, 162 N. W. 1056, L. R. A. 1917E, 784; Janney v. Minneapolis Ind. Exposition, 79 Minn. 488, 82 N. W. 984, 50 L. R. A. 273; 13 Am. Jur., Corporations, §§ 985, 997. Nor is this a case where the authority of the board of directors is involved. Their action in giving the original $17,000 mortgage, as well as the subsequent renewals thereof, was with full knowledge, in fact was the act of the stockholders themselves. See Ebert-Hicken Co. v. Scott-Bevier I. Min. Co. 177 Minn. 72, 224 N. W. 454.

Majority stockholders of a corporation are not precluded from entering into contracts with it, making loans to it, or taking mortgages upon corporate property as security for its indebtedness to them. See Minnesota L. & T. Co. v. Peteler Car Co. 132 Minn. 277, 156 N. W. 255; 6 Thompson, Corporations (3 ed.) § 4476. But a court of equity examines such personal transactions with a large measure of watchful care, if not with distrust; and, unless satisfied that such transactions were entered into in good faith with a view

to benefiting the corporation and its creditors, it refuses to lend its aid to their enforcement. Ebert-Hicken Co. v. Scott-Bevier I. Min. Co. and Minnesota L. & T. Co. v. Peteler Car Co. *supra;* Taylor v. Mitchell, 80 Minn. 492, 83 N. W. 418; Richardson's Executor v. Green, 133 U. S. 30, 10 S. Ct. 280, 33 L. ed. 516; 3 Fletcher, Cyc. Corp. (Perm. ed.) § 908.

The trial court's finding that the A. Wells Company was insolvent in 1928 when it executed the original $17,000 mortgage, as well as at the time of the execution of the subsequent mortgages, is unassailable. But the Ranneys, as stockholders, were not prejudiced by the execution of the respective mortgages, even though the corporation was insolvent at the time, for, upon liquidation of the corporate affairs, the Wells estate, as a creditor of the corporation, even though it held no mortgage, would have been entitled to payment before the stockholders. Allen v. Llano Del Rio Co. 166 La. 77, 90, 91, 116 So. 675, 680. Furthermore, absent actual intent to defraud, a mortgage based upon a fair consideration is valid even if it renders the transferor insolvent. Nelson v. Poss, 172 Minn. 149, 214 N. W. 787; Klaseus v. Meester, 173 Minn. 468, 217 N. W. 593; Watson v. Goldstein, 174 Minn. 423, 219 N. W. 550.

■ Under the trust fund theory prevailing in South Dakota, the act of a corporation in purchasing its own stock is *ultra vires* where the effect of such purchase is to diminish and lessen the security of its creditors. Adams & Westlake Co. v. Deyette, 8 S. D. 119, 65 N. W. 471, 31 L. R. A. 497, 59 A. S. R. 751; s. c. 5 S. D. 418, 59 N. W. 214, 49 A. S. R. 887. Such would unquestionably be the rule even in jurisdictions where the trust fund theory does not prevail, for it is recognized by all authorities that a corporation cannot purchase its own stock to the injury of its existing creditors. 13 Am. Jur., Corporations, § 787. But again the questions arise whether the Ranneys, or the corporation in which they have become the sole stockholders, are in a position to urge the *ultra vires* character of the stock-purchase agreement.

A stockholder who participates in and consents to an illegal or *ultra vires* transaction by the corporation, or who, with full knowl-

edge, acquiesces therein, or accepts pecuniary benefits thereunder, is generally estopped from calling in question the validity of such acts. 13 Am. Jur., Corporations, § 761; 1 Morawetz, Private Corporations (2 ed.) § 262; 3 Fletcher, Cyc. Corp. (Perm. ed.) § 1104. Under such circumstances, courts of equity have uniformly declined to interfere. 4 Thompson, Corporations (3 ed.) § 2906; Lake Park Development Co. v. Paul Steenberg Const. Co. 201 Minn. 396, 276 N. W. 651; Barrett v. Smith, 183 Minn. 431, 442, 237 N. W. 15, 20; Stewart v. Erie & Western Transp. Co. 17 Minn. 372, 399 (Gil. 348, 375).

So it is held that a stockholder who has acquired his stock from directors, officers, or other stockholders who are alleged to have committed the wrong and mismanagement of the corporation's affairs has no standing to complain thereof. 13 Am. Jur., Corporations, § 456; 2 Thompson, Corporations (3 ed.) § 1414; 6 *Id.* § 4509. This is unquestionably true where a stockholder has acquired his shares from the alleged wrongdoer with full knowledge of the latter's wrongdoing. Home F. Ins. Co. v. Barber, 67 Neb. 644, 93 N. W. 1024, 60 L. R. A. 927, 108 A. S. R. 716; Clark v. American Coal Co. 86 Iowa 436, 53 N. W. 291, 17 L. R. A. 557. Even where the stockholder's predecessor has merely acquiesced in a course of mismanagement, the present holder is refused redress. 2 Thompson, Corporations (3 ed.) § 1414.

If a stockholder or his assignor has acquiesced in the misconduct complained of, he should be estopped to use his own name or that of the corporation to set aside the transaction. Ratification, of course, to be effective, must be with full knowledge of the facts. Gross Iron Ore Co. v. Paulle, 132 Minn. 160, 156 N. W. 268. But in the instant case the minority stockholders had full knowledge and actively participated, though they assert that they acquiesced in the *ultra vires* transactions through coercion and redress, which claim we have already disposed of.

Anderson, in his Limitations of Corporate Entity (§ 238), disposes of a situation practically identical to the one we are discussing, as follows:

380

"Where a stockholder, seeking to obtain all of the stock of the corporation, transfers property of the corporation to stockholders in satisfaction of their stock, which stock is in turn transferred to such sole stockholder, he cannot thereafter, either in his own name or in the corporate name, bring suit against the stockholders who have thus received the corporate property upon the ground of an improper diversion of the corporate property to its stockholders. To do this would be to allow such sole stockholder to take advantage of his own wrong," citing Stony Brook Lbr. Co. v. Blackman, 286 Pa. 305, 133 A. 556.

■ The fact that upon final consummation of the stock-purchase agreement Thomas K. Ranney had 200 shares of stock registered in his wife's name for convenience or otherwise cannot aid their cross-bill, which is otherwise devoid of equity, she having silently acquiesced for more than six years since she acquired the stock in 1933. Stony Brook Lbr. Co. v. Blackman, *supra,* cited with approval in 3 Fletcher, Cyc. Corp. (Perm. ed.) § 1104.

A corporation, as well as its minority stockholders who claim injury or damage by fraudulent acts of the directors or by *ultra vires* acts of the corporation, must act promptly and not wait an unreasonable time. Laches and acquiescence as effectually bar relief in this situation as in any other. 13 Am. Jur., Corporations, §§ 460, 761; 4 Thompson, Corporations (3 ed.) § 2906; 6 *Id.* §§ 4582, 4583; Stewart v. Erie & Western Transp. Co. 17 Minn. 372, 398 (Gil. 348, 375); Boldenweck v. Bullis, 40 Colo. 253, 90 P. 634; Moore v. Silver Valley Min. Co. 104 N. C. 534, 10 S. E. 679; Alexander v. Searcy, 81 Ga. 536, 8 S. E. 630, 12 A. S. R. 337; Erny v. G. W. Schmidt Co. 197 Pa. 475, 484, 47 A. 877, 880.

■ The right of the corporation itself to complain of the transaction is, in this case, no greater than that of the Ranneys. If the Ranneys have no standing in equity to entitle them to the relief sought exclusively, they cannot obtain such relief through the corporation. The court must look behind the corporate structure to the shareholders who would be the exclusive beneficiaries of a recovery, for equity looks to the substance and not to the form. In

matters growing out of complex corporate affairs, such as here in-volved, it is very necessary for a court to adhere to that maxim and avoid the danger of allowing its equitable remedies to be abused. Courts and text writers are in entire agreement that equity will look behind the corporation and consider who are the real and substantial parties in interest whenever it becomes neces-sary to do so to promote justice or obviate inequitable results. 13 Am. Jur., Corporations, § 7; Home F. Ins. Co. v. Barber, 67 Neb. 644, 93 N. W. 1024, 60 L. R. A. 927, 108 A. S. R. 716; Stony Brook Lbr. Co. v. Blackman, 286 Pa. 305, 133 A. 556.

Morawetz, at the very beginning of his treatise, writes:

"* * * it is essential to a clear understanding of many impor-tant branches of the law of corporations to bear in mind distinctly, that the existence of a corporation independently of its share-holders is a fiction; and that the rights and duties of an incor-porated association are in reality the rights and duties of the per-sons who compose it, and not of an imaginary being." 1 Morawetz, Private Corporations (2 ed.) § 1. See also §§ 227, 229, 232.

Thompson says:

"* * * if the proceeding is in equity, or of an equitable nature, or if relief is sought upon rules or principles of equity, the conduct of stockholders in connection with the act or contract in controversy may prevent any relief or recovery on the part of the corporation. In such case a court of equity will not forget that the stockholders are the real and substantial beneficiaries of any recovery that may be had; and if the stockholders themselves have no standing in equity and are not themselves equitably entitled to the remedy sought to be enforced by the corporation for their advantage, then the corporation itself can not recover." Thompson, Corporations, § 2904.

Disregarding the legal concept that a corporation is a distinct entity, courts of equity have repeatedly held that where an individ-ual owns all, or practically all, the stock of a corporation, the cor-poration and such individual will be regarded as one and the same

if the equities of a case so require. Swift v. Smith, Dixon.& Co. 65 Md.. 428, 5 A. 534, 57 Am. R. 336; Anderson, Limitations of Corporate Entity, § 70. The concept has also been disregarded where acts have been done or assented to by the whole body of shareholders, and an attempt has been made to evade liability by conjuring with the corporate name. 1 Morawetz, Private Corporations (2 ed.) § 262; Sheldon H. B. Co. v. Eickemeyer H. B. M. Co. 90 N. Y. 607; Hotel Co. v. Wade, 97 U. S. 13, 23, 24 L. ed. 917; Home F. Ins. Co. v. Barber, 67 Neb. 644, 93 N. W. 1024, 60 L. R. A. 927, 108 A. S. R. 716, *supra*.

As said in Arkansas R. L. T. & C. Co. v. Farmers' L. & T. Co. 13 Colo. 587, 598, 22 P. 954, 958:

"* * * a body corporate cannot maintain a suit for equitable relief, except as the representative of the stockholders.

"It necessarily follows that if the shareholders are without equity they cannot, through the corporate organization, or in its name, obtain relief either for themselves or for the corporation."

Applying these principles to the case before us, it is clear that the extent of the trial court's authority in respect to the $18,000 mortgage was to protect the interests of the plaintiff creditors. So far as the defendant corporation and the Ranneys, its sole stockholders, are concerned, the mortgage must be held to be a valid and enforceable obligation to the extent that it remains unpaid after crediting payments made thereon subsequent to the date of its execution and delivery.

The trial court properly found that the assignment of rents was executed on the same day and as part of the same transaction as the $18,000 mortgage, notwithstanding the two instruments purport to bear different dates. This being true, the assignment, insofar as it authorized the mortgagee to collect rentals and to apply the same upon the mortgage debt before default, is in plain violation of Minn. St. 1941, § 559.17 (Mason St. 1927, § 9572), as an attempt to grant to the mortgagee the right to the possession of the mort-gaged property before foreclosure; but the provisions of the assignment authorizing application by the mortgagee of the rentals to

the payment of taxes and assessments levied against the mortgaged property are enforceable notwithstanding. Fidelity-Philadelphia Trust Co. v. West, 178 Minn. 150, 226 N. W. 406; Cullen v. Minnesota L. & T. Co. 60 Minn. 6, 61 N. W. 818; Orr v. Bennett, 135 Minn. 443, 161 N. W. 165, 4 A. L. R. 1396; Larson v. Orfield, 155 Minn. 282, 193 N. W. 453.

The judgment is affirmed as to the two plaintiffs, and reversed so far as it grants affirmative relief to the defendant corporation and Thomas K. Ranney and Ruth M. Ranney, its stockholders, on their respective cross-complaints, with the qualification noted in respect to the assignment of rents.

So ordered.

### On Appeal from Taxation of Costs

On June 16, 1944, the following opinion was filed:

Per Curiam.

The clerk, over objection of respondent A. Wells Company, allowed costs and disbursements in favor of appellants, including allowance, at 90 cents per page, for printing 127 pages of briefs ($144), 457 pages of record ($411.30), and 162 pages of exhibits ($145.80). A. Wells Company objects to these items on two grounds: (1) that the allowance of 90 cents per page is excessive, and (2) that the printed record (including exhibits) contains much material which was relevant only to the issues between the plaintiff-respondents and appellants, and wholly irrelevant to the issues upon which appellants prevailed as against the A. Wells Company.

In support of the first of these objections, the A. Wells Company offers the affidavit of Fred L. Hayward, owner of the Hayward Brief Printing Company of Minneapolis, extensively engaged in the printing of briefs and records of this court, that the reasonable value of printing a record of 100 pages or more, exclusive of exhibits, is 60 cents per page and that the reasonable value of printing a brief is 75 cents per page. Appellants' affidavit in support of their application for taxation of costs states that the actual cost of printing the exhibits was $466.25 (a rate of more than $2.87

per page), and of printing the record proper, $469.40 (a rate of more than $1.00 per page).

The order now in force governing such items was adopted on September 30, 1918, and reads:

"It is ordered that after October 1, 1918, there be allowed and taxed as a disbursement to the prevailing party a sum not exceeding 90 cents per page for printing his brief and such parts of the record as are required by the rules to be printed for the use of the court." See, 2 Dunnell, Dig. § 2239, p. 340.

Notwithstanding that some printers still quote prices less than the maximum so prescribed, we are not disposed to disallow the maximum upon a showing that it was actually incurred, especially in view of the recent high increases in printing costs.

But appellants only partially prevailed on their appeal, and they cannot be allowed disbursements in printing matter which was relevant only on the issues between them and the prevailing plaintiff-respondents. To allocate precisely all parts of the record to distinct issues would be impracticable. However, upon examination of the record and exhibits, we have determined that only 364 pages of the record and 126 pages of the printed exhibits should be taxed against the respondent A. Wells Company, at 90 cents per page, together with statutory costs, postage, and premium on the appeal bond.

So ordered.