**Richard TANZI et al.**

v.

**FIBERGLASS SWIMMING POOLS, INC.**

**No. 78–9–Appeal.**

Supreme Court of Rhode Island.

May 9, 1980.

William Young Chaika, Cranston, for plaintiffs.

Winograd, Shine & Zacks, P. C., Allan M. Shine, E. Martin Stutchfield, Providence, for defendant.

## OPINION

KELLEHER, Justice.

This is an appeal from a Superior Court judgment that denied the plaintiffs' petition to reclaim corporate assets in the hands of the permanent receiver. The dispute essentially concerned the nature of cash advances made to the corporation, Fiberglass Swimming Pools, Inc. (Fiberglass), by the plaintiffs, Richard Tanzi, its president, operator-owner, and controlling stockholder, and his mother, Lucy Tanzi.

A brief review of the business history of Fiberglass Swimming Pools, Inc., will set the present controversy in its proper perspective. Richard Tanzi testified that he began selling and installing swimming pools in 1967 and that he incorporated the business in 1968. He explained further that he, his mother, and father, who has since died, had been the sole stockholders in Fiberglass since its corporate birth. According to Richard's testimony, when the company was first formed, he was operating from his automobile on a part-time basis with a small number of hand tools and subcontracting portions of the pool installations to others who owned the necessary equipment. As the business prospered, he invested additional personal funds in order to purchase equipment and hire additional personnel. Richard "guesstimated" that during its first year of operation, Fiberglass sold "seven or eight pools" for a gross sales of approximately $35,000. When questioned regarding the maximum corporate sales volume, Richard conceded that the 1973 tax return reflecting gross sales of $238,000 was undoubtedly correct. He explained that because the pool business was seasonal, every spring he would withdraw his personal funds in order to begin pool installations after the winter shutdown. This financing method continued during the life of the corporation. In 1972, it became apparent that in order to stay in business, corporate expansion would be necessary. Accordingly, Richard again transferred personal funds to Fiberglass in order to buy excavation equipment and to construct a model pool for display purposes. At that time,

Richard purchased the needed equipment for cash. During 1972, his mother, Lucy, also transferred $25,000 of her personal funds to the corporation, allegedly as a loan. On the 1973 corporate financial statement, the cash advances to Fiberglass were reflected as outstanding loans. Richard acknowledged that sometime in 1973 he had received $5,000 as repayment for money that he had transferred to Fiberglass.

According to the accountant for the corporation, the business was solvent in 1973. The accountant also verified that in 1974 gross corporate sales had dropped from approximately $238,000 for the previous year to $145,950 and that throughout the life of the corporation capital investment remained at its initial level of $3,000.

Apparently, the swimming-pool business at some point began to flounder, and Richard Tanzi petitioned the corporation into receivership on March 10, 1976. A permanent receiver was appointed on April 1, 1976. A week later, the receiver filed a petition to sell the tangible assets of the corporation free and clear. On the same day, the Tanzis filed a petition for reclamation of certain corporate equipment, alleging that the equipment had been pledged as security for a corporate $40,818.76 promissory note executed on November 23, 1973. The receiver immediately disputed plaintiffs' claim, contending that if the security interest were allowed, substantial corporate assets "otherwise available to general creditors" would be reclaimed by Richard Tanzi, the "former controlling stockholder and principal" of the corporation. The receiver on April 23, 1977, filed a motion for summary judgment because no financing statement for the alleged note had been filed with the office of the Secretary of State. The Tanzis objected and also immediately moved for summary judgment.

The Superior Court hearings on plaintiffs' petition for reclamation began on May 6, 1977, with the assertion by the receiver that the advances to the corporation were contributions to capital that should be subordinated to the claims of general creditors. At the same time, the receiver disputed the

existence of the security interest because the financing statement, filed under the name Fiberglass Pools, Inc., omitted the word "Swimming" from the corporate name.

At the outset, the trial justice decided that both of the motions for summary judgment were "procedurally inappropriate" to receivership proceedings and consequently denied them both. After two days of somewhat sketchy testimony, the trial justice sitting without a jury indicated that the omission of the word "Swimming" from the corporate name would not, as a matter of law, invalidate the financing statement. This portion of the trial justice's decision is not in dispute. The trial justice next considered whether the cash advances made by the Tanzis to Fiberglass should be deemed loans to the corporation or contributions to corporate capital. He assigned the burden of proving the existence of a loan to the Tanzis, but he remained unconvinced that, in fact, a loan transaction had occurred. Consequently, on May 11, 1977, the trial justice denied plaintiffs' petition to reclaim corporate assets, characterized plaintiffs' transactions as "capital contributions," and subordinated their claims to those of the general creditors.

On appeal the Tanzis challenge the ruling of the trial justice on three grounds. First, they contend that the trial justice improperly shifted the burden of proof to them by relieving the receiver of the burden of proving "whether or not the security agreement was a fraudulent conveyance." Secondly, the Tanzis claim that the trial justice erred in excluding testimony that denominated their transactions with the corporation as "loans" whereby they expected repayment. Finally, the Tanzis argue that denial of their claim constitutes reversible error because the trial justice disregarded the "uncontradicted and unimpeached evidence" before him that confirmed the nature of their transactions as loans.

 As we have repeatedly stated, on appeal we shall not disturb the factual findings of a trial justice sitting without a jury unless the trial justice was clearly wrong or overlooked or misconceived material evidence. *LaPorte v. Ramac Associates, Inc.,* R.I., 395 A.2d 719, 721 (1978); *Coastal Finance Corp. v. Coastal Finance Corp. of North Providence,* R.I., 387 A.2d 1373, 1377 (1978). We have also noted that the trial justice's role in the factfinding process includes the drawing of inferences. Ordinarily, we shall accept such inferential findings as valid and binding as long as they are reasonable, logical, and flow from the established facts. His findings will stand even though other equally reasonable inferences might have been drawn from the evidence. *Robidoux v. Pelletier,* R.I., 391 A.2d 1150, 1155 (1978); *Jerry Brown Farm Association v. Kenyon,* R.I., 375 A.2d 964, 968 (1977).

In the present controversy, the trial justice at the close of testimony drew certain inferences regarding the structure and management of Fiberglass. He concluded that in 1968, when the corporation was formed, the initial investment of capital was slightly more than $3,000; that the stock was apparently owned by the three Tanzis—Richard, his father, and his mother—although no verifying documents were presented to the court; and that Richard in 1972 decided to expand by purchasing new capital equipment, namely, a backhoe, dump truck, pay loader, and a van. Further, the trial justice found as a matter of fact that in June 1972 Richard advanced $9,000 to Fiberglass from his personal funds and in October of that year withdrew an additional $9,675 from his personal account for transfer to the corporation; that Lucy in 1972 withdrew a total of $25,000 from her personal bank accounts and lent this money to her son, Richard, and not to the corporation. Richard then used the money to purchase the capital assets in question. The trial justice noted further that Richard had paid for the equipment in cash rather than finance it subject to a security interest from either a bank or the seller. Finding that the transactions were "suspect," the trial justice apparently attached great significance to the fact that the promissory note was not executed until over a year

after the final cash advance was made to Fiberglass.[1]

Accordingly, the trial justice held that the money represented a "contribution to capital * * * [used] for the operation of this corporation * * *," thus rejecting the debtor-creditor theory advanced by the Tanzis. The action of the trial justice released to Fiberglass creditors an additional $21,000 held by the permanent receiver. In our view, the trial justice was correct.

■ We find no merit in the Tanzis' contention that the trial justice impermissibly relieved the receiver of the burden of proving "whether * * * the security agreement was a fraudulent conveyance." The record is devoid of suggestion that the receiver ever asserted that this case involved a fraudulent conveyance. On the contrary, the receiver's opening statement specifically delineated the disputed transactions as "contributions to capital."

■ We now respond to the Tanzis' contention that the trial justice erred when he refused to allow them to testify that their cash advances constituted "loans" to Fiberglass for which they expected to be repaid. In the present controversy, the receiver objected at the outset to testimony by the Tanzis in which they described their transactions with Fiberglass as "loans." The trial justice often sustained the objection on the ground that "loan" was a "legal conclusion." At other times, however, when the objection to the word was advanced on other grounds, the trial justice permitted the testimony to stand. Here, the word "loan" was the ultimate fact to be determined by the court. Furthermore, the trial justice did admit into evidence the promissory note, the financing statement, the security agreement, and various bank passbooks that disclosed withdrawals of the sums alleged to be "loans." In addition, the record

indicates that Richard did testify that sometime in 1973 he was repaid $5,000 of the money he had advanced to Fiberglass. Accordingly, we find no merit to the loan-evidence argument presented by the Tanzis.

■ Turning finally to Richard's and Lucy's claim that the trial justice's factual findings are based purely on speculation and fancy, we would first point out that as a matter of law there is nothing to prevent "*bona fide* transactions between a corporation and its principal shareholder, including those which result in the shareholder's becoming a creditor of the corporation." Henn, *Corporations* § 152 at 269 (2d ed. 1970). *See also* 3 Fletcher, *Cyclopedia of the Law of Private Corporations* § 907 at 350–51, § 952 at 450–51 (rev. perm. ed. 1975).

The question of what treatment is to be accorded such claims most often arises in receivership or bankruptcy proceedings. *Id.* Even though a shareholder loan is not per se invalid,[2] *Vennerbeck & Clase Co. v. Juergens Jewelry Co.*, 53 R.I. 135, 140–41, 164 A. 509, 511 (1933), *In re Erie Drug Co.*, 416 Pa. 41, 43–44, 204 A.2d 256, 257 (1964), *In re Mader's Store for Men*, 77 Wis.2d 578, 602, 254 N.W.2d 171, 185 (1977), obviously the transaction is subject to strict judicial scrutiny. *Obre v. Alban Tractor Co.*, 228 Md. 291, 294, 179 A.2d 861, 862 (1962); *Erickson-Hellekson-Vye Co. v. A. Wells Co.*, 217 Minn. 361, 377–78, 15 N.W.2d 162, 171 (1944). The general rule would also permit corporate directors and officers as well as shareholders to attain creditor status for loans advanced to the corporation. 16 Fletcher, *Cyclopedia of the Law of Private Corporations* § 7919 at 647 (rev. perm. ed. 1979). It goes without saying that courts are particularly watchful in all these situations because of the fiduciary status that officers and dominant shareholders must

---

1. Richard Tanzi executed the promissory note on behalf of the corporation on November 23, 1973. On the same day, the Tanzis signed and filed the financing statement with the office of the Secretary of State pursuant to G.L. 1956 (1969 Reenactment) § 6A–9–302 and § 6A–9–304.

2. We do, however, have statutory guidelines regarding director conflicts of interest. General Laws 1956 (1969 Reenactment) § 7–1.1–37.1, as amended by P.L.1970, ch. 136, § 9, specifically permits corporate directors and officers to transact business with their corporations provided the statutory conditions have been met.

observe vis-a-vis the corporation when the individual acts both for himself and for the corporation. *Point Trap Co. v. Manchester*, 98 R.I. 49, 54, 199 A.2d 592, 596 (1964), 3 Fletcher, *Cyclopedia of the Law of Private Corporations* § 918 at 373–74 (rev. perm. ed. 1975).

■ With this background in mind, we now proceed to consider the Tanzis' contention that their claim should have received priority because they were secured creditors of Fiberglass. The issue narrows to whether these transactions by the Tanzis first met the requirements of valid loans in that a debtor-creditor relationship ever existed between them and Fiberglass. The trial justice remained unconvinced, as do we. Clearly, persons making capital contributions are not corporate creditors. *Albert Richards Co. v. The Mayfair, Inc.*, 287 Mass. 280, 288, 191 N.E. 430, 434–35 (1934); 15A Fletcher, *Cyclopedia of the Law of Private Corporations* § 7622 at 755 (rev. perm. ed. 1967).

We have not previously articulated standards regarding the distinction between a bona fide debt and a contribution to capital. Our decision in *Entwistle v. Enjaco Corp.*, 97 R.I. 224, 197 A.2d 271 (1964), merely affirmed that the transactions in question were bona fide loans to the corporation and not further investments of capital without reviewing the controlling law. *Id.* at 228, 197 A.2d at 273–74. Coincidentally, the Entwistles, like the Tanzis, attempted to substantiate their claims as corporate loans also through trial exhibits and testimony of their withdrawals from personal savings. *Id.*

Similarly, in *Vennerbeck & Clase Co. v. Juergens Jewelry Co.*, 53 R.I. 135, 164 A. 509 (1933), we affirmed the creditor status of the sole stockholder of the insolvent corporation despite creditors' contentions that these "should be deemed additional contributions of capital * * *," but did so again without enunciating reasons therefor. *Id.* at 140, 164 A. at 511. Nor do we have statutory guidance to help us differentiate a shareholder loan from a capital contribution.

Accordingly, we look to decisions in other jurisdictions for enlightenment and guidance. We are not so much interested in the results in each case as we are in the method used by the court to arrive at its decision. For example, the Court of Appeals of Maryland found that the note of the corporation to its principal stockholder represented a debt and not a contribution to capital; yet we find their reasoning in *Obre v. Alban Tractor Co.*, 228 Md. 291, 179 A.2d 861 (1962), helpful to the issue before us. The court in particular considered whether the corporation formed with a risk capital of $40,000 was under-capitalized. *Id.* at 295–96, 179 A.2d at 863. In addition, the court took into account that the note was listed on the monthly financial reports of the corporation as a debt and that an interest provision was included although interest was never paid. *Id.* at 297, 179 A.2d at 864.

In *Weyerhaeuser Co. v. Clark's Material Supply Co.*, 90 Idaho 455, 461, 413 P.2d 180, 183 (1966), the Supreme Court of Idaho found that the transaction under review did not meet the requirements of a valid loan and hence the shareholder and his wife could not share in the distribution of the corporate assets. In reaching its decision, the court considered the following factors: the husband and wife were not listed on the corporate records as creditors; no note was executed; and they did not regard the security advanced earlier as a loan until after a decision was reached in litigation concerning the appointment of the corporate receiver. *Id.* at 458–59, 413 P.2d at 181.

■ We also note with approval a recent well-reasoned decision by the Supreme Court of Wisconsin in which it reversed the trial court's decision to subordinate a director-shareholder loan. In *In re Mader's Store for Men*, 77 Wis.2d 578, 254 N.W.2d 171 (1977), the court collected and analyzed cases in which advances to a corporation were subordinated on the capital contribution theory and extracted the following relevant factors: (1) was the claimant in a position to control corporate affairs "at least to the extent of determining the form of the transaction * * *"; (2)

were the advances intended to be repaid in the ordinary course of the corporation's business; and (3) was the paid-in stated capital "unreasonably small in view of the nature and size of the business in which the. corporation was engaged." *Id.* at 604–05, 254 N.W.2d at 186. In our view, the *Mader* court correctly indicated that a breach of fiduciary duties was not a prerequisite to treating shareholder advances as capital contributions. Although it reached a contrary result, we would agree with the *Mader* court: "Inequity enough to justify subordination exists when it is shown that a claim which is in reality a proprietary interest is seeking to compete on an equal basis with true creditors' claims." *Id.* at 605–06, 254 N.W.2d at 187.

The *Mader* proposal that subordination of a shareholder advance to a corporation is mandated whenever the facts of the case indicate a proprietary interest rather than a debt echoes the reasoning of the trial justice in the controversy before us. The record reveals the following remarks by the trial justice:

> "There is something wrong about this whole transaction. It has an aura about it. It is suspect. It seems clear to me from the evidence, that Richard Tanzi operated this corporation essentially as an individual proprietorship."

Interestingly, the *Mader* court cited numerous bankruptcy decisions also relied upon by the receiver in the present case. We feel that the reasoning in the bankruptcy cases may also be instructive in the present controversy. We are mindful of our earlier decision in *Hill v. M.S. Alper & Son, Inc.*, 106 R.I. 38, 55, 256 A.2d 10, 19 (1969), where we refused to permit "using the bankruptcy act as a springboard for avoiding a transfer otherwise permitted under our state law." This holding does not, however, preclude borrowing principles enunciated in federal bankruptcy cases concerning the propriety of subordinating shareholder advances to claims of general creditors. *Leonard Levin Co. v. Star Jewelry Co.*, 54 R.I. 465, 468, 175 A. 651, 653 (1934).

These bankruptcy cases and their legal principles have been succinctly discussed in Cohen, *Shareholder Advances: Capital or Loans?*, 52 Am.Bankr.L.J. 274 (1978). In the bankruptcy context, the following criteria have been considered in determining the treatment of the disputed advancements: the adequacy of capital contribution, the ratio of shareholder loans to capital, the amount of shareholder control, the availability of similar loans from outside lenders, and certain relevant questions, such as, whether the ultimate financial failure was caused by under-capitalization, whether the note included repayment provisions and a fixed maturity date, whether a note or debt document was executed, whether proceeds were used to acquire capital assets, and how the debt was treated in the corporate records.

These recurring themes also emerge from the internal revenue cases, although in somewhat distinctive factual context. In the tax situation, the debt or equity distinction resolves the question of whether amounts qualify as bad-debt deductions for internal revenue purposes. *E. g., Berkowitz v. United States*, 411 F.2d 818 (5th Cir. 1969); *United States v. Henderson*, 375 F.2d 36 (5th Cir. 1967); *Montclair, Inc. v. Commissioner of Internal Revenue*, 318 F.2d 38 (5th Cir. 1963); *Fin Hay Realty Co. v. United States*, 261 F.Supp. 823 (D.N.J. 1966); *Brinker v. United States*, 116 F.Supp. 294 (N.D.Cal.1953).

Applying the criteria enunciated earlier to the facts in this case, we conclude that the trial justice was justified in finding that the cash advancements to Fiberglass were contributions to risk capital rather than bona fide loans to the corporation. We feel that the initial risk capital of $3,000 was inadequate to sustain corporate sales in excess of $200,000. Furthermore, Richard Tanzi completely controlled the corporation, a factor to which the trial justice specifically alluded as follows: "As long as it [Fiberglass] was making profits, he was taking the profits out. When he needed money to buy additional assets or run the business, he put money in." On balance, the transaction

itself bore very few earmarks of an arm's length bargain. The note lacked either interest, repayment, or default provisions and had no fixed maturity date. Although an actual repayment of $5,000 was made to Richard Tanzi, this factor is offset by the fact that the proceeds, in reality, were used to acquire capital assets necessary for corporate expansion. Finally, the belated execution of the promissory note strongly suggests that it was an attempt in form rather than in substance to protect the family investment. Surely, under these circumstances, in which repayment safeguards were virtually nonexistent, an outside lender would have been foolhardy to risk its funds. The Tanzis' "loan," therefore, qualified as a contribution to capital that was correctly subordinated to the claims of the general creditors.

In view of the foregoing discussion, we do not find that the trial justice was clearly wrong or that he overlooked or misconceived material evidence. Accordingly, the Tanzis' appeal is denied and dismissed, and the judgment appealed from is affirmed.

DORIS, J., did not participate.